**FILED**
**SEPTEMBER 17, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30411-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| FABIAN ARREDONDO, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. —A jury found Fabian Arredondo guilty of second degree murder and three counts of first degree assault. Mr. Arredondo appeals, contending that (1) the trial court violated his constitutional public trial right, (2) the trial court abused its discretion in admitting ER 404(b) testimony of an earlier drive-by shooting, (3) the court erred in denying his motion to question a State witness regarding his mental state, (4) insufficient evidence supported the gang enhancement aggravating circumstance, and (5) the court abused its discretion in imposing the costs of incarceration legal financial obligation as part of his sentence. We disagree with Mr. Arrendondo's first four contentions, but reverse the imposition of the per day legal financial obligations and remand for a new hearing in that regard.

## FACTS

On the evening of December 5, 2009, three Sureño gang members went to a party together at a house in Toppenish, Washington. Most of the people at the party were members of the rival Norteño gang. Shortly after they arrived, several people exchanged angry words, and a brief fistfight ensued between one of the Sureños and two other people. Fabian Arredondo is a member of the Norteño gang, and he was at the party that evening but was not involved in the fight. Some of the Norteños at the party were carrying guns, but Mr. Arredondo was not seen with a gun.

Most people left the party after the fight. The three Sureños drove off in a white station wagon and picked up a fourth person who was walking along the street. They noticed another car from the party behind them and sped up to get away, but the car continued following them. The car following them was a Honda with tinted windows. Someone in the white station wagon said they saw a gun and yelled to duck. Shots were fired from the Honda, and one of the shots went through the window of the station wagon and hit the driver causing the station wagon to crash into a tree. The driver later died at the hospital. Mr. Arredondo was charged with first degree murder and three counts of first degree assault related to the December 5, 2009 drive-by shooting.

Before trial began, Mr. Arredondo filed a motion in limine to permit cross-examination of State witness, Maurice Simon, regarding Mr. Simon's mental health. Before making its ruling, the trial court allowed questioning of Mr. Simon regarding his

2

mental condition outside the presence of the jury. During that questioning, Mr. Simon revealed that he has problems with depression, concentration, comprehension, anxiety, distrust of other people, hypervigilance, post-traumatic stress disorder (PTSD), and substance abuse involving both alcohol and methamphetamine. Mr. Simon stated that while his substance abuse might affect his short-term memory, none of these problems affect his long-term memory. After this testimony, the court determined that none of Mr. Simon's issues affect his "ability to accurately recall and to describe the events or alleged events that he is going to be called upon to describe in his testimony." Report of Proceedings (RP) at 566-67. The court also concluded that the prejudicial effect outweighed the probative value of testimony regarding his mental health. The court barred any inquiry into Mr. Simon's mental state now or in the past, including his substance abuse.

Mr. Simon, who was Mr. Arredondo's cellmate in jail for five to eight days, testified Mr. Arredondo had talked about the December 5, 2009 drive-by shooting with him. Mr. Simon stated Mr. Arredondo had told him he was a member of the Norteño gang. Mr. Arredondo had also told Mr. Simon that the night of the shooting, he and his cousin Rudy had borrowed the keys to a Honda from someone at the house party they were at and chased down another vehicle that had also come from the party. Mr. Arredondo said he was driving with Rudy in the passenger seat, and when the cars were

3

side by side, Rudy had shot somebody in the other car. Finally, Mr. Arredondo had told him the people in the other car were from the rival Sureño gang.

Before trial, Mr. Arredondo also moved in limine to prohibit the State from introducing evidence of a drive-by shooting that occurred on February 9, 2009, under ER 404(b). The trial court denied the motion finding that the probative value outweighed the prejudicial effect.

During opening statements, the State told the jury it would hear evidence regarding the February 9, 2009 drive-by shooting. The prosecutor stated, "Mr. Arredondo was driving a Mercedes to an area in Yakima, drove past a rival gang's location and fired some shots there." RP Supp.-2B at 273.

Dustin Dunn, a detective for the Toppenish Police Department, testified he responded to a report of a drive-by shooting on February 9, 2009 in a "high gang area." RP at 468. The person who reported the shooting said the suspect's vehicle "appeared to be like a Mercedes." RP at 468. Detective Dunn found a .380 caliber shell casing in the street in front of the residence where the drive-by occurred. Before Detective Dunn's testimony regarding the incident in February 2009, the court gave a limiting instruction, stating,

> There's going to be testimony that's offered, I believe starting now, regarding an incident that allegedly occurred on February the 9th of 2009.
> That—the testimony regarding that particular incident can be considered by you in only one way. Okay? You can only consider it in

4

regard to the issue of whether—the issues of identity and motive and intent of the Defendant. Okay?

So you cannot consider it as to whether Mr. Arredondo may or may not be a bad person or may or may not have acted in a similar fashion on February the 9th of 2009 to what he's alleged to have done on December the 5th of 2009. You can only consider the testimony regarding the incident of February 9, 2009, only on the issues of motive, intent, and identity.

RP at 466.

Michael Hisey, community corrections officer for the Washington State Department of Corrections (DOC), testified that on February 23, 2009, he and two other officers contacted Mr. Arredondo at an address in Zillah, Washington, based on reports he was selling drugs out of the residence. A silver Mercedes was parked in the area, and Mr. Arredondo had possession of the keys to the Mercedes. The officers searched the vehicle and found a .380 caliber shell casing. Before Corrections Officer Hisey's testimony, the court referenced the limiting instruction given regarding Detective Dunn's testimony and stated that the same instruction applied.

Terry Franklin, a forensic scientist from the Washington State Patrol Crime Laboratory, analyzed both .380 shell casings and found they were fired from the same firearm.

Jaban Brownell, a detective for the Toppenish Police Department, testified that the residence where the February 9, 2009 drive-by shooting occurred is located in an area of Toppenish populated by members of the Sureño gang. Detective Brownell stated that the

rival Norteño gang was involved in that shooting. Detective Brownell also testified more generally about the characteristics of street gangs, stating, "[A]s you work up the gang life-style, the more credit you have as far as crimes you've committed, how much you've hustled . . . you earn a certain level of prestige and respect amongst the gang members and even rival gang members." RP at 684.

After the State rested, Mr. Arredondo moved to dismiss the gang enhancement aggravating circumstance, arguing that there was insufficient evidence to support the aggravator. The court denied his motion, finding sufficient evidence in the record to support the gang enhancement allegations.

The jury found Mr. Arredondo guilty of second degree murder and three counts of first degree assault. The jury also found by special verdict that Mr. Arredondo committed the crimes with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang, its reputation, influence, or membership. The court imposed an exceptional sentence of an additional 60 months' incarceration per count for this aggravating circumstance. The court ordered the sentences for each count to run consecutively. The sentence totaled 1,083 months.

The court also entered a finding, without inquiring on the record, that Mr. Arredondo had the ability to pay legal financial obligations (LFOs). One of the LFOs imposed was the costs of incarceration at a rate of $50 per day, or in excess of $1.6 million.

6

Mr. Arredondo appeals, contending that (1) the trial court violated his constitutional public trial right by excluding the public from a portion of the jury selection, (2) the trial court abused its discretion in admitting ER 404(b) testimony related to the February 9, 2009 drive-by shooting, (3) the trial court erred in denying his motion to question the State's witness Maurice Simon regarding his mental state, (4) insufficient evidence supported the gang aggravating circumstance, and (5) the trial court abused its discretion in imposing $50 per day costs of incarceration as part of his sentence.

Mr. Arredondo filed a motion on March 6, 2013, to remand the case to the trial court for the taking of additional evidence related to the public trial issue. A commissioner of this court issued a ruling ordering remand on March 7, 2013.

The trial judge presided over the reference hearing held June 27, 2013. Testimony revealed the Yakima County Courthouse hours were 8:00 a.m. to 4:00 p.m. at the time of Mr. Arredondo's trial. Courthouse policy was that if a trial continued past 4:00 p.m., the staff of the court would call courthouse security and security would keep the courthouse doors open with security personnel posted at the doors. If a session of trial went past 4:00 p.m., the policy was also to allow any members of the public wanting to watch Mr. Arredondo's trial to be admitted to the courthouse and directed to a courtroom. Also, if enough security officers were available, the officers would check whether any courts were still in session past 4:00 p.m.

Jury selection began on October 10, 2011, and continued on October 11. The report of proceedings reflects that the October 10 session ended at 4:11 p.m. During the October 11 session, the court mentioned the new security policy wherein security officers lock the doors to the courthouse at 4:00 p.m. The court intended to adjourn by 4:00 p.m. every day of the trial to avoid any potential violations of Mr. Arredondo's right to a public trial. Later that day, the court stated:

> [W]e need to finish the jury selection this afternoon, because there's another trial starting tomorrow that's going to be in this courtroom and that they're going to be using Courtroom 3 for jury storage.
>  . . . .
> So, I'll make the finding . . . that the need to conclude the jury selection process this afternoon is an extraordinary circumstance warranting us going past four o'clock and potentially conducting . . . some small portion of the jury selection process in an open courtroom in a locked courthouse.

RP Supp.-2B at 239-40. The report of proceedings reflects that on October 11 jury selection was completed at 4:17 p.m. The court then read the preliminary instructions to the jury members and dismissed the jury and adjourned court at 4:24 p.m.

The sign posted on the exterior entrance door at the time of the trial stated,

COURTHOUSE
CLOSES AT 4 PM.
AUDITOR @ 3:30.
COURT HEARINGS
UNTIL 5 PM.

State's Ex. L. The sign posted inside the courthouse near the entrance said,

No. 30411-6-III
*State v. Arredondo*

COURTHOUSE
CLOSES AT 4 PM.
OFFICE HOURS
AUDITOR 9-3:30
HR 9-4:00
DC CLERKS 8-4:00
SC CLERKS 8:30-4:00
ALL OTHERS 8-4:00
COURT CLOSES @ 5 PM.

State's Ex. M.

Howard Delia, consultant for the Yakima court system, testified that he never received a complaint that a member of the public wanted to see a trial after 4:00 p.m. but was denied access to the courthouse. Mr. Delia admitted on cross-examination that the signs could be interpreted to mean a person would have to actually be inside the building prior to 4:00 p.m. to attend a court session going beyond 4:00 p.m.

Testimony also revealed a person approaching the entrance doors would see the sign on the door but would not be able to see the security officer posted by the metal detector or in the office. However, a member of the public could see the security officer by the metal detector if he or she entered the first set of entrance doors and looked through the second set of doors.

Kacy Siebol, a security officer on duty on the days in question, testified he did not believe a member of the public who approached the entrance door and read the sign could see any of the officers on duty because none of the officers stand directly in front of the doors. Officer Siebol did not recall where in the building he was posted on the days in

9

question. Officer Siebol acknowledged on cross-examination that there could have been members of the public who approached the entrance doors, read the sign, and then left without trying to get the security officer's attention.

Ron Rogers, another security officer on duty on the days in question, testified that the security procedure around the time of Mr. Arredondo's trial was to lock the doors at 4:00 p.m. If a member of the public wanted in the building to watch the trial, he or she would need to knock or pull on the door to get the security officer's attention. The officer would then ask the person why he or she was there, and if the person indicated it was for court, the officer would allow that person to enter the building.

The court entered findings of fact and conclusions of law for the reference hearing. The court found that on October 10, 2011,

> the court hearings concluded before 4 p.m. because the clock or time listed on the transcript for October 10, 2011 was in error because no two clocks in this courthouse have the same time. The time stamp on the [Jefferson Audio Visual System (JAVS)] recording system, which is reflected in the report of proceedings, is not synced to the actual time and is off by a significant amount. There is a discrepancy in the clerk's minutes in comparison to the JAVS times on the transcript. The courtroom clocks are also ahead by about six minutes. The court used the bench computer, which accurately reports the time, to keep track of the hour.

Clerk's Papers (CP) at 112. As for the session on October 11, 2011, the court found that the judge anticipated having to go past 4:00 p.m. and thus properly conducted a *Bone-*

No. 30411-6-III
*State v. Arredondo*

*Club*[1] analysis when it concluded it was necessary to continue the proceedings to complete jury selection that day. Additionally, "the amount of time between the jury being sworn and the adjournment was only for a few minutes. On the 11th of October, the court was recessed at 4:10 not at 4:17, which is the incorrect time, from the JAVS recording noted n [sic] the report of proceedings." CP at 113. The court also found that on October 10-11, 2011, "the public entrance of the Yakima County Courthouse was not closed or locked at 4:00 p.m. because a courtroom was still in session in which case security officers kept the public entrance open until all courts were no longer in session for that day." CP at 114. Thus, the court concluded that Mr. Arredondo's public trial rights were not violated.

## ANALYSIS

1. *Whether the trial court violated Mr. Arredondo's constitutional public trial right*

Mr. Arredondo contends the trial court violated his constitutional right to a public trial when it held a portion of jury selection in an open courtroom but a closed courthouse. The State argues that no violation of his public trial right occurred because members of the public still had access to the courthouse for purposes of watching court hearings going past 4:00 p.m. when the courthouse officially closed.

---

[1] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

The State also contends that Mr. Arredondo's failure to raise this issue in the trial court precludes him from raising it on appeal. However, "[d]efendants can raise claims of public trial rights violations for the first time on appeal." *State v. Andy*, 182 Wn.2d 294, 301, 340 P.3d 840 (2014). Such claims receive de novo review on appeal. *Id.* It is the defendant's burden to provide a record that establishes a closure occurred. *Id.*

A defendant's constitutional right to a public trial extends to jury selection. *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Any affirmative act by the trial court to fully close a courtroom to spectators during jury selection is a violation of the public trial right, unless the court enters findings justifying the closure under the requirements of *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995). *Bone-Club* requires an on-the-record, case-by-case weighing of the following five factors:

> "1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
> "2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
> "3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> "4. The court must weigh the competing interests of the proponent of closure and the public.
> "5. The order must be no broader in its application or duration than necessary to serve its purpose."

No. 30411-6-III
*State v. Arredondo*

128 Wn.2d at 258-59 (quoting *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

Here, during the October 11, 2011 hearing, the court stated:

[W]e need to finish the jury selection this afternoon, because there's another trial starting tomorrow that's going to be in this courtroom . . . .

. . . .

. . . I'll make the finding that the need to conclude the jury selection process this afternoon is an extraordinary circumstance warranting us going past four o'clock and potentially conducting . . . some small portion of the jury selection process in an open courtroom in a locked courthouse.

RP Supp.-2B at 239-40. The report of proceedings reflects that jury selection was completed at 4:17 p.m. The court then read the preliminary instructions to the jury members and dismissed the jury and adjourned court at 4:24 p.m. After the reference hearing, the court found that it had properly conducted a *Bone-Club* analysis. On appeal, Mr. Arredondo contends that the court's statement quoted above from the October 11 hearing did not constitute a sufficient *Bone-Club* analysis.

However, if the trial court does not actually close the courtroom during jury selection, the court need not engage in a *Bone-Club* analysis. *See State v. Brightman*, 155 Wn.2d 506, 515-16, 122 P.3d 150 (2005). On remand, the court heard testimony from court officials and security officers. Based on this testimony, the court entered findings that all members of the public were able to access the courtroom at all times during the trial and that no member of the public was deterred by the sign posting the courthouse hours. Specifically, the court found that on October 10 and 11,

13

the public entrance of the Yakima County Courthouse was not closed or locked at 4:00 p.m. because a courtroom was still in session in which case security officers kept the public entrance open until all courts were no longer in session for that day. Yakima County's policy was that the public entrance remained open as long as any courtroom was in session. The courts and security officers followed this policy.

CP at 114. Mr. Arredondo challenges the sufficiency of the evidence to support these findings.

This court reviews findings from a reference hearing for substantial evidence. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 410, 972 P.2d 1250 (1999). As long as some reasonable interpretation of the evidence supports the trial court's findings, this court will not reweigh any conflicting evidence. *Id.* at 411. And credibility determinations are for the trier of fact. *Id.* at 410-11.

The facts revealed at the reference hearing in this case are nearly identical to those in the recently-decided *Andy* case, where the Washington Supreme Court upheld the remand court's finding that no closure occurred. 182 Wn.2d at 301-02. Both cases were tried at the Yakima County Courthouse, and the signs posted on the courthouse door during both trials used the same language. However, there are two differences between this case and *Andy*. For one, the court in *Andy* concluded, "[T]he evidence shows that at all times during Andy's trial proceedings, the door to the courthouse was *unlocked* . . . ." *Id.* at 297.

Here, the parties presented conflicting evidence as to whether the outside courthouse doors were locked. Several courthouse security officers testified that the general policy of the court at the time of Mr. Arredondo's trial was to leave the external courthouse doors unlocked and to post security officers at the doors to greet and direct any members of the public trying to enter the courthouse after the courthouse's official closure at 4:00 p.m. to the hearing he or she wanted to attend. However, Ron Rogers, one of the two security officers on duty at the time in question, testified that the security procedure around the time of Mr. Arredondo's trial was to lock the doors at 4:00 p.m. If a member of the public wanted in the building to watch the trial, he or she would need to knock or pull on the door to get the security officer's attention. The officer would then ask the person why he or she was there, and if the person indicated it was for court, the officer would allow that person to enter the building.

The second difference between this case and *Andy* is that while the court in *Andy* concluded, "All of the evidence indicates that the sign presented no obstacle to members of the public who wished to attend the trial," 182 Wn.2d at 302, here, two witnesses admitted that the sign could be a deterrent. Officer Kacy Siebol, the second officer on duty during the time in question, acknowledged on cross-examination that there could have been members of the public who approached the entrance doors, read the sign, and then left without trying to get the security officer's attention. Howard Delia, consultant for the Yakima court system, also admitted on cross-examination that the signs could be

15

interpreted to mean a person would have to actually be inside the building prior to 4:00 p.m. to attend a court session going beyond 4:00 p.m.

Despite these two differences, we believe that the outcome here should be the same as *Andy*. First, even if the courthouse doors were locked, officers were present to admit members of the public trying to enter. The courtroom itself was not locked. Second, while the courthouse signs may have been worded poorly, this court does not reweigh conflicting evidence where the evidence can reasonably be interpreted to support the trial court's finding that the signs did not deter members of the public. Thus, substantial evidence supports the court's findings from the reference hearing.

Finally, Mr. Arredondo relies on *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009) in his briefing, but this reliance is misplaced. In *Strode*, the court allowed questioning of at least 11 prospective jurors in chambers, and 6 of them were challenged for cause, all out of the presence of the public. 167 Wn.2d at 227. Here, jury selection took place in an open courtroom, not in the judge's chambers.

We conclude that there was no courtroom closure and, therefore, we need not address Mr. Arredondo's *Bone-Club* argument.

16

2. *Whether the trial court abused its discretion in admitting ER 404(b) testimony of other acts*

Mr. Arredondo contends the trial court abused its discretion in allowing evidence of an earlier drive-by shooting contrary to ER 404(b) where there was insufficient proof that he was the perpetrator of the other act.

ER 404(b) provides that evidence of other crimes or acts is not admissible to show that a person acted in conformity with his character but is admissible for other purposes. These other purposes include proof of motive, intent, and identity. Where, as here, the State seeks admittance of an uncharged crime, the trial court must "(1) find by a preponderance of the evidence that the uncharged acts probably occurred, (2) identify the purpose for which the evidence is admitted, (3) find that the evidence is relevant to that purpose, and (4) balance the probative value of the evidence against its prejudicial effect." *State v. Stein*, 140 Wn. App. 43, 65, 165 P.3d 16 (2007). This court reviews a trial court's admission of ER 404(b) evidence for an abuse of discretion. *State v. Freeburg*, 105 Wn. App. 492, 497, 20 P.3d 984 (2001).

Here, Mr. Arredondo moved in limine to prohibit the State from introducing evidence under ER 404(b) of a drive-by shooting that occurred on February 9, 2009. In support of his motion, Mr. Arredondo argued that he was never charged for the offense, which occurred 10 months earlier, and the State sought to introduce evidence that was insufficient to prove his involvement. Additionally, the February 2009 shooting did not

17

involve any of the same people as the December 2009 shooting at issue in this case.

Thus, he argued the other crime evidence did not fall within one of the exceptions to

ER 404(b) and was unduly prejudicial. The State then described the evidence it planned

to offer related to the February 2009 shooting and argued that it was offering this

evidence to show both common scheme or plan and identity. The State argued that the

evidence was relevant and its probative value outweighed the prejudicial effect.

After these arguments from both sides, the trial court denied the defense motion in

limine. In reaching its decision, the court stated:

> Well, it's as—I think under [ER] 404(b) it has probative value. I think the
> probative value in identifying that is Mr. Arredondo's animosity towards
> people who are of the Sureño persuasion, if you would, and it goes to show
> identity, and motive as well.
>     So, under the circumstances, I believe that the probative value
> outweighs the prejudicial effect. I'll allow testimony regarding the earlier
> incident.

RP (Oct. 10, 2011, Suppl.) at 26-27. During the trial, the court gave a limiting instruction

to the jury before testimony related to the February 2009 shooting, stating:

> [T]he testimony regarding that particular incident can be considered by you
> in only one way. Okay? You can only consider it in regard to the issue of
> whether—the issues of *identity* and *motive* and *intent* of the Defendant.
> Okay?
>     So you cannot consider it as to whether Mr. Arredondo may or may
> not be a bad person or may or may not have acted in a similar fashion on
> February 9th of 2009 to what he's alleged to have done on December the
> 5th of 2009.

RP at 466 (emphasis added).

18

On appeal, Mr. Arredondo takes issue with the first and the last elements of the four-part analysis for admissibility of an uncharged crime under ER 404(b). While the court's oral ruling focused on the fourth element, its analysis was sufficient as to the other elements as well.[2] The State presented evidence of two shell casings fired from the same weapon; one was found outside the Toppenish residence where the February 9, 2009 drive-by shooting occurred and another was found in a Mercedes parked outside the residence where Mr. Arredondo was contacted by police a couple of weeks later. Mr. Arredondo had possession of the keys to the Mercedes at that time. The person who reported the February 2009 shooting said the suspect's vehicle "appeared to be like a Mercedes." RP at 468. Testimony also revealed the address where the shooting occurred was in a high gang area populated by Sureños. This evidence is sufficient to prove by a preponderance that the uncharged acts probably occurred. Thus, the first element of the four-part analysis was satisfied.

The trial court's analysis as to element four was also sufficient. The court stated that the probative value of the evidence was to demonstrate Mr. Arredondo's animosity

---

[2] "A trial court may determine that uncharged crimes probably occurred based solely on the State's offer of proof." *Stein*, 140 Wn. App. at 66. And where a court's ruling regarding the admissibility of ER 404(b) evidence immediately follows arguments by both sides on the matter "and the court clearly agrees with one side, an appellate court can excuse the trial court's lack of explicit findings." *Id.* While the trial court did not explicitly state that it found by a preponderance of the evidence that Mr. Arredondo was probably involved in the February 2009 drive-by shooting, the record is sufficient to show that the court made this finding before reaching its decision.

toward rival Sureños. The purposes for which the trial court admitted this evidence were motive, intent, and identity. The court determined that the probative value outweighed the prejudicial effect. Because this weighing determination is the province of the trial court, not the appellate court, we are reluctant to determine otherwise. We find no abuse of discretion in the admission of the ER 404(b) evidence related to the February 9, 2009 drive-by shooting. *See State v. Herzog*, 73 Wn. App. 34, 50, 867 P.2d 648 (1994).

3.  *Whether the trial court erred in denying Mr. Arredondo's motion to question a State's witness regarding his mental state*

Mr. Arredondo argues his Sixth Amendment right of confrontation was violated when the trial court barred any inquiry into the mental state of State witness, Maurice Simon, during cross-examination. The State contends that the witness did not exhibit any mental disability while on the stand and was clearly competent, and thus the trial court properly exercised its discretion to deny the motion.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to confront and cross-examine adverse witnesses." *State v. Perez*, 139 Wn. App. 522, 529, 161 P.3d 461 (2007). This right is not absolute and is subject to the following limits: "(1) the evidence sought to be admitted must be relevant and (2) the defendant's right to introduce relevant

evidence must be balanced against the State's interest in precluding evidence so prejudicial as to disrupt the fairness of the fact-finding process." *Id.*

It is fundamental that a defendant in a criminal trial be given great latitude in cross-examining witnesses on credibility. *State v. Peterson*, 2 Wn. App. 464, 466, 469 P.2d 980 (1970). Generally, the trial court has discretion to admit evidence of a witness's mental condition for impeachment purposes. *State v. Froehlich*, 96 Wn.2d 301, 306, 635 P.2d 127 (1981). Mental deficiency impeachment evidence is relevant when the deficiency is readily apparent and the witness's competency is a central issue in the case. *Id.* at 306-07. Absent abuse of discretion, this court will not reverse a trial court's ruling regarding the scope of cross-examination. *Perez*, 139 Wn. App. at 529-30.

The *Perez* court found an abuse of discretion where the trial court did not allow the defendant to question the witness regarding his mental state at the time of trial even though the witness "had given confused and inarticulate testimony, and . . . the trial court observed that [the witness] appeared confused and disoriented." *Id.* at 530. In *Froehlich*, the court upheld the trial court's decision to permit a psychiatrist to testify about a witness's mental condition where the witness testified on direct examination regarding his mental state and the witness's nervous condition was readily apparent while he was on the witness stand. 96 Wn.2d at 304-05, 308.

The facts in this case are distinguishable from both *Perez* and *Froehlich*. Unlike the witnesses in both of those cases, Mr. Simon did not display any readily apparent

21

mental deficiencies while on the witness stand. The court permitted questioning of Mr. Simon regarding his mental condition outside the presence of the jury. During that examination, counsel for appellant referenced three mental health evaluations that revealed Mr. Simon has problems with depression, concentration, comprehension, anxiety, distrust of other people, hypervigilance, PTSD, and substance abuse of both alcohol and methamphetamine. However, Mr. Simon testified that while his substance abuse might affect his short-term memory, none of these issues affect his long-term memory. Mr. Arredondo did not produce any evidence to the contrary.

Division Two of this court has held that evidence of drug use is only admissible to impeach a witness if there is a reasonable inference that the witness was under the influence of drugs either at the time of the incident or at the time of testifying at trial. *State v. Tigano*, 63 Wn. App. 336, 344, 818 P.2d 1369 (1991). Here, there is no evidence Mr. Simon was under the influence at the time he shared a cell with Mr. Arredondo or while testifying. In addition, allowing Mr. Simon to testify as to these problems that have no effect on his long-term memory would not have aided the jury in its credibility determination of Mr. Simon's ability to "observe, recollect and communicate truthfully." *Froehlich*, 96 Wn.2d at 307. We conclude that the trial court did not abuse its discretion when it barred defense cross-examination of Mr. Simon's mental state.

22

*4.     Whether there was sufficient evidence to support the street gang aggravator*

Mr. Arredondo next contends that there is insufficient evidence to support the street gang aggravating factor. He contends the only evidence presented was that Mr. Arredondo was a member of the Norteño gang, the victim was a Sureño gang member, and the Norteños and Sureños are rival gangs. He argues that based on these facts alone, it would be conjecture to presume these crimes were committed for the reasons stated in the aggravating circumstance.

This court will review "a jury's verdict on an aggravating factor for substantial evidence just as [it does] when evaluating the sufficiency of the evidence supporting the elements of a crime." *State v. DeLeon*, 185 Wn. App. 171, 212, 341 P.3d 315 (2014). "After viewing the evidence in a light most favorable to the State[,] we ask whether any rational trier of fact could have found the essential elements of the charge beyond a reasonable doubt." *Id.* In this case, the relevant statute, RCW 9.94A.535(3)(aa), requires the State to prove beyond a reasonable doubt that Mr. Arredondo's involvement in the drive-by shooting was based on his desire "to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership."

In *State v. Moreno*, 173 Wn. App. 479, 495-97, 294 P.3d 812 (2013), *review denied*, 177 Wn.2d 1021 (2015), this court affirmed the trial court's imposition of an exceptional sentence under RCW 9.94A.535(3)(aa). At trial, the State presented

23

evidence that (1) Mr. Moreno had ties to the Norteños, (2) that he and his cohorts were found in Sureños territory without a credible reason immediately after the shooting was reported, and (3) somebody in Mr. Moreno's car yelled out a gang-related phrase moments before the shooting. *Id.* at 496-97. Additionally, a gang expert testified that the Norteños and Sureños were rivals, both gangs were territorial and would not invade rival gang turf without a specific reason, and gang members often commit random acts of violence as a way to maintain or improve their status within the gang. *Id.* at 497. From these facts, this court concluded, "[T]he evidence shows a sufficient nexus between the crime and gang membership to prove the gang aggravator." *Id.*

Similarly, in *DeLeon*, this court concluded the evidence was sufficient to support the gang aggravator's application to all three defendants. 185 Wn. App. at 212-13. The operative facts were (1) that the defendants' gang membership was abundantly demonstrated in the record, (2) that there was a gang-related motivation for their presence in a Sureño neighborhood and for their shooting at a Sureño-associated home, (3) that the defendants were wearing red bandannas over their faces, and (4) that the shooting was a response to the victim flashing a rival gang sign. *Id.* And again, the State provided expert testimony regarding gang culture and retaliation specific to the Norteño gangs. *Id.* at 213.

Here, Mr. Arredondo admitted that he is a member of the Norteños and that he had become a member after growing up in the gang lifestyle. Additionally, testimony

24

revealed that Mr. Arredondo was at a house party with other Norteños the night of the shooting. Some of the Norteños at the party were carrying guns. The victim and his friends, some of who were members of the rival Sureño gang, arrived at the party. Shortly thereafter, an altercation occurred between members of the rival gangs. Most people left the party after the fight, including the victim and his friends, and the drive-by shooting followed. Detective Brownell, assigned as the street crimes detective for the Toppenish Police Department, testified regarding the rivalry between the Norteños and Sureños, as well as what parts of the city are controlled by which gang. He also testified generally regarding the gang lifestyle wherein members "earn a certain level of prestige and respect amongst the gang members and even rival gang members" based on the number of crimes they have committed and how much they have hustled. RP at 684. Thus, this evidence, which is comparable to the evidence in both *Moreno* and *DeLeon*, establishes the required nexus between the drive-by shooting and Mr. Arredondo's motivations to benefit his gang.

5.    *Whether the trial court erred when imposing the $50 per day legal financial obligation as part of Mr. Arredondo's sentence*

The sentencing court ordered Mr. Arredondo to pay the costs of incarceration at a rate of $50 per day for the term of the prison sentence of 1,083 months. The judgment and sentence contained a generalized finding of financial ability, which included the following language:

25

**2.7 Financial Ability:** The Court has considered the total amount owing, the defendant's past, present, and future ability to pay legal financial obligations, including the defendant's financial resources and the likelihood that the defendant's status will change. The Court finds that the defendant has the present ability or likely future ability to pay the financial obligations imposed herein. RCW 9.94A.753.

CP at 91. The judgment and sentence also included a separate finding specific to the costs of incarceration, which read:

**4.D.4 Costs of Incarceration:** In addition to the above costs, the court finds that the defendant has the means to pay for the costs of incarceration, in prison at a rate of $50.00 per day of incarceration . . . and orders the defendant to pay such costs at the statutory rate as assessed by the Clerk. Such costs are payable only after restitution costs, assessments and fines listed above are paid. RCW 9.94A.760(2).

CP at 94. Other than these preprinted, boilerplate findings, no evidence in the record relates to Mr. Arredondo's financial means. Mr. Arredondo challenges the trial court's imposition of the costs of incarceration. He contends that the sentencing court failed to make an individualized inquiry as to whether he had the means to pay these LFOs as required by RCW 9.94A.760(2). It is undisputed that Mr. Arredondo raises this issue regarding LFOs for the first time on appeal. For this reason, the State contends this court should decline review.

"A defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review." *State v. Blazina*, 182 Wn.2d 827, 832, 344 P.3d 680 (2015). RAP 2.5(a) provides that an "appellate court may refuse to review any claim of error which was not raised in the trial court." The rule then goes on

26

to provide three exceptions that allow an appeal as a matter of right. RAP 2.5(a). Mr. Arredondo does not argue that one of the RAP 2.5(a) exceptions applies. In *Blazina*, the Washington State Supreme Court recently confirmed an appellate court's discretion under RAP 2.5(a) extends to review of a trial court's imposition of discretionary LFOs. 182 Wn.2d at 833-35.

*Blazina* involved LFOs authorized by RCW 10.01.160(3). There, the court held that under RCW 10.01.160(3), "sign[ing] a judgment and sentence with boilerplate language stating that it engaged in the required inquiry" is insufficient and that instead, a sentencing court must make an "individualized inquiry into the defendant's current and future ability to pay" on the record. *Blazina*, 182 Wn.2d at 838. Here, the LFOs at issue are the costs of incarceration, which are governed by RCW 9.94A.760(2). Although different in language, both statutes include an imperative that the court make a determination regarding the defendant's ability to pay when imposing a discretionary cost. *Compare* RCW 9.94A.760(2) (stating "If the court determines that the offender, at the time of sentencing, has the means to pay for the cost of incarceration, the court may require the offender to pay for the cost of incarceration at a rate of fifty dollars per day of incarceration . . . .") *with* RCW 10.01.160(3) (stating "The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them."). *Blazina* applies here.

27

No. 30411-6-III
*State v. Arredondo*

Thus, this court has the discretion to decline review of Mr. Arredondo's discretionary LFOs. In this case, we consider the administrative burden and expense of bringing Mr. Arredondo to a new sentencing hearing and the likelihood that the LFO result would change. An important consideration of this analysis is the dollar amount of discretionary LFOs imposed by the sentencing court.

Here, the trial court imposed over $1.6 million of discretionary LFOs against Mr. Arredondo. We conclude that the administrative burden and expense of bringing Mr. Arredondo back for resentencing is minor in comparison to the likelihood that the LFO result will change.

We affirm in part, but reverse and remand the imposition of the $50 per day LFO for a new sentencing hearing, or, possibly entry of an agreed order amending the judgment by striking the $50 per day costs. In the event that such an agreed order is entered, Mr. Arredondo's personal presence will be unnecessary.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

I CONCUR:

Brown, A.C.J.

28

30411-6-III

KORSMO, J. (dissent) — I concur in all but the majority's decision to remand this case for a hearing concerning the discretionary legal financial obligations (LFOs). I would decline to reach the LFO issue in this case because the existing order has no practical consequences for Fabian Arredondo. If he should leave prison and be subject to the LFO order, it will not be until the dawn of the 22nd century.

Mr. Arredondo, age 30 at the time he committed these crimes, faces 20 years in prison "straight time" before gaining the opportunity to earn early release credit at the rate of 15 percent against the remaining 843 months on his sentence. With maximum credit, he will be nearing his 110th birthday before he need worry about the impact of these LFOs on his life, and that assumes he already will have paid nearly $20,000 of restitution and mandatory court costs before these discretionary costs might come due. Clerk's Papers at 93-94. There will be plenty of time to put the question to the trial court should it become anything other than an academic query.

For that matter, Mr. Arredondo has other current options to put the question of his LFOs before the trial judge. He could bring a timely motion under CrR 7.8(b). He could seek remission of his obligations under RCW 10.01.160(4). He has the opportunity to raise the issue if he genuinely wants to do so.

We have noted in the past that a defendant facing sentencing has great incentive not to raise the question of his ability to pay financial obligations. *State v. Duncan*, 180 Wn. App. 245, 250, 327 P.3d 699 (2014), *review granted*, 353 P.3d 641 (2015). For that reason, we have declined to hear these claims when raised initially on appeal. *Id.* at 253. The Washington Supreme Court agreed that we have discretion to hear or decline to hear this issue. *State v. Blazina*, 182 Wn.2d 827, 832-834, 344 P.3d 680 (2015). Given the forceful language of *Blazina*, I have little doubt that trial judges in the future will live up to their statutory obligation to inquire about ability to pay at sentencing, to the probable consternation of many of those appearing before them.[1]

But sentencing in this case occurred four years before *Blazina* and I see nothing to be gained here by putting the county to the expense of a resentencing in a case that already had presented significant security concerns. Accordingly, I respectfully dissent from the decision to return this case to the trial court for consideration of the discretionary LFOs.

_____
Korsmo, J.

---

[1] By remanding, the majority wrongly assumes that it was error to impose the incarceration costs. We cannot tell that on this record. The court's error, if there was one, was in ordering the costs without conducting the necessary inquiry into Mr. Arredondo's ability to pay. Although highly unlikely, the outcome of that inquiry might show that he does have the ability to pay.