**FILED**

**May 17, 2016**

In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32974-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| LARRY JAMES BELT, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — A jury convicted Larry James Belt of two counts of

first degree assault. Mr. Belt argues on appeal: (1) the jury instruction that defines

"reasonable doubt" as a doubt "for which a reason exists" requires articulation of the

reason, and is therefore unconstitutional, (2) the trial court erred when it imposed

discretionary legal financial obligations (LFOs) without conducting an individualized

inquiry into his ability to pay, and (3) he received ineffective assistance of counsel when

his attorney failed to object to the imposition of LFOs. Mr. Belt argues in his statement

of additional grounds for review (SAG) that certain witnesses perjured themselves, and

prosecutorial misconduct occurred when the prosecutor asked a leading question that

caused a witness to change his answer. We disagree with Mr. Belt's contentions and affirm.

FACTS

On January 3, 2014, Larry Belt entered Wendy's Steakhouse and Lounge in Ephrata, Washington. The restaurant's owner, Jeanette Johnson, was working alone. Mr. Belt asked Ms. Johnson to use her cell phone so he could call his ex-wife. After his third call to his ex-wife, Mr. Belt became visibly upset. According to Ms. Johnson, Mr. Belt "turned around and he looked at me and he reached inside of his jean jacket and he pulled out this huge knife." Report of Proceedings (RP) (Dec. 10, 2014) at 41. Ms. Johnson used her phone to call her husband who was at a nearby house. She then called 911, and Mr. Belt "just went nuts." RP (Dec. 10, 2014) at 46. According to Ms. Johnson, Mr. Belt chased her around the bar while she was on the phone with 911. Eventually, Ms. Johnson was able to escape to a restaurant next door.

Greg Thompson, Ms. Johnson's husband, entered the bar shortly thereafter and got into a physical altercation with Mr. Belt. Mr. Belt lacerated Mr. Thompson's stomach, neck, and various fingers. The State charged Mr. Belt with two counts of first degree assault, both with special allegations that he was armed with a deadly weapon other than a firearm.

At Mr. Belt's trial, Ms. Johnson testified that during her encounter with Mr. Belt, he put a knife to his own throat and stated: "I'm going to go cut [my ex-wife's] fucking throat, and then I'm going to cut your fucking throat." RP (Dec. 10, 2014) at 42. Ms. Johnson further testified that when Mr. Belt then pointed the knife toward her she called Mr. Thompson for help. Ms. Johnson believed Mr. Belt would become more agitated if she called 911. During cross-examination, Ms. Johnson testified that Mr. Thompson was approximately three to four minutes away when she called him. Mr. Belt attempted to run to the other side of the bar with the knife, and Ms. Johnson testified: "I had the phone and I'm calling 911 as I'm running up the other end of the bar trying to keep the bar between him and I." RP (Dec. 10, 2014) at 47. Ms. Johnson testified that Mr. Belt chased her around the bar and that she was on the telephone with 911 the entire time, although she hung up once and had to call back. According to Ms. Johnson, she was able to escape and she ran to AJ's Eatz and Drinkz (AJ's) next door.

Mr. Thompson testified that he was watching television when Ms. Johnson called him, and it took him about two minutes to get to Wendy's. According to Mr. Thompson, when he arrived at Wendy's his wife no longer was there, and Mr. Belt was walking around the bar acting like he was looking for someone or something. Mr. Thompson testified that Mr. Belt walked briskly toward him and said "I'm going to fuck you up."

3

RP (Dec. 10, 2014) at 100. Once Mr. Belt approached Mr. Thompson, Mr. Thompson punched Mr. Belt. Mr. Thompson testified he did not see anything in Mr. Belt's hands. Mr. Thompson knocked Mr. Belt down, but Mr. Belt got up, threw a barstool at him, and then hit him in the right eye. Mr. Thompson testified that he tripped over a bar stool, and then Mr. Belt got on top of him and said "I'm going to cut your fucking throat." RP (Dec. 10, 2014) at 106. According to Mr. Thompson, Mr. Belt began to cut his throat with a steak knife, but he was able to grab the knife, cutting his fingers in the process.

Todd Godfrey and Jared Torgeson were in AJ's when Ms. Johnson came in. Ms. Johnson testified that she told people at AJ's that someone was in her bar and had threatened her with a knife; although, she could not remember if she said someone had been stabbed. Mr. Godfrey and Mr. Torgeson went to Wendy's Steakhouse to see if anyone needed help.

The State, questioning Mr. Thompson, asked:

> Q. —the two guys showed up?
>       Okay. When those two guys showed up, what did they do?
> A. Basically, they saw that—I believe they saw that I had the knife. I was pretty tired then. And, you know, we had been kind of doing this for quite some time, and I was exhausted. And so I was just hanging on.
> Q. Okay.

4

A. And they basically took him and I think they took the knife away from him and put him on the floor and held him down until the cops got there.

Q. All right. I just want to be clear. I thought you said earlier during this answer that you had a knife or is that inaccurate?

A. I never had a knife. I had a hold of the knife, the hand with the knife on it.

RP (Dec. 10, 2014) at 109. Mr. Torgeson and Mr. Godfrey testified they saw Mr. Thompson and Mr. Belt struggling over a knife in Wendy's, and they wrestled the knife away from Mr. Belt. When the police arrived, Mr. Torgeson and Mr. Godfrey were subduing Mr. Belt. Ms. Johnson testified that when she went back to Wendy's, she was on the phone with 911, and she saw Mr. Belt handcuffed on the ground and Mr. Thompson sitting on a barstool bleeding.

Mr. Belt's version of events differed from the other witnesses. Mr. Belt testified he did not have a knife when he went into Wendy's and he did not threaten to harm Ms. Johnson or anyone else. According to Mr. Belt, he was talking to Ms. Johnson when Mr. Thompson entered the bar with two other men and confronted Mr. Belt by stating, "What the fuck are you doing with my old lady?" RP (Dec. 11, 2014) at 301. According to Mr. Belt, he stabbed Mr. Thompson with a steak knife from the bar after Mr. Thompson charged him with a knife. Mr. Belt's closing statement questioned Ms. Johnson's and

5

Mr. Thompson's version of events, and generally argued that Mr. Belt acted in self-

defense.

Jury instruction 3 defined "reasonable doubt" as follows:

> A reasonable doubt is one for which *a reason exists* and may arise
> from the evidence or lack of evidence. It is such a doubt as would exist in
> the mind of a reasonable person after fully, fairly, and carefully considering
> all of the evidence. If, from such a consideration, you have an abiding
> belief in the truth of a charge, you are satisfied beyond a reasonable doubt
> as to that charge.

Clerk's Papers (CP) at 39 (emphasis added). The first sentence in this definition is

identical to language contained in Washington Pattern Jury Instruction 4.01.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL

4.01, at 85 (3d ed. 2008) (WPIC). Mr. Belt's defense counsel did not object to jury

instruction 3.

On December 12, 2014, the jury found Mr. Belt guilty of both counts of first

degree assault, along with finding that he was armed with a deadly weapon other than a

firearm when he committed both offenses. On December 16, 2014, the trial court

sentenced Mr. Belt to 264 months' confinement.

The trial court also imposed the following LFOs: a $500.00 victim assessment fee,

a $200.00 criminal filing fee, a $100.00 deoxyribonucleic acid (DNA) collection fee,

$750.00 in fees for a court-appointed attorney, and $4,656.85 in restitution. The

judgment and sentence contains the following boilerplate LFO language: "The court has considered the total amount owing, the defendant's present and future ability to pay legal financial obligations, including the defendant's financial resources and the likelihood that the defendant's status will change." CP at 56. During the sentencing hearing, defense counsel stated that the 53-year-old Mr. Belt was "able-bodied," but had some medical conditions. RP (Dec. 16, 2014) at 6. The trial court did not conduct an individualized inquiry into Mr. Belt's current or future ability to pay LFOs on the record, nor did defense counsel object to the LFOs. During the sentencing hearing, the trial court also granted Mr. Belt's order of indigency for purposes of appeal. In Mr. Belt's declaration accompanying his motion for indigency, he indicated that he had no real property, no personal property other than effects, no debts, no income from any sources, and no money to contribute toward the expense of the appeal.

Mr. Belt timely appealed.

## ANALYSIS

1. *Constitutionality of the reasonable doubt instruction*

Mr. Belt first contends that jury instruction 3, which defined "reasonable doubt" as a doubt "for which a reason exists," was constitutionally deficient because it required the jury to articulate a reason for having a reasonable doubt. Relying on *State v. Emery*, 174

7

Wn.2d 741, 760, 278 P.3d 653 (2012), Mr. Belt also argues instruction 3 resembles the improper "fill in the blank" prosecutorial closing arguments.

There is a "fundamental constitutional due process requirement that the State bear the burden of proving every element of a crime beyond a reasonable doubt." *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015); *accord State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). The State must prove the defendant committed the crime beyond a reasonable doubt because "[t]he presumption of innocence 'is the bedrock upon which the criminal justice system stands.'" *Kalebaugh*, 183 Wn.2d at 584 (quoting *State v. Bennett*, 161 Wn.2d 303, 315, 165 P.3d 1241 (2007)). A "'reasonable doubt, at a minimum, is one based upon reason.'" *Bennett*, 161 Wn.2d at 311 (internal quotation marks omitted) (quoting *Victor v. Nebraska*, 511 U.S. 1, 17, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994)). However, "the law does not require that a reason be given for a juror's doubt." *Kalebaugh*, 183 Wn.2d at 585. "Although no specific wording is required, jury instructions must define reasonable doubt and clearly communicate that the State carries the burden of proof." *Bennett*, 161 Wn.2d at 307. This court reviews jury instruction challenges de novo, in the context of the instructions as a whole. *Id.*

The State responds that Mr. Belt did not object to the alleged error below, and the error is not a manifest error of constitutional magnitude under RAP 2.5(a)(3).

8

Specifically, the State argues that "the alleged error here is not manifest because the jury instruction complies with clear, binding precedent, and the trial court could not correct it." Br. of Resp't at 4.

"An established rule of appellate review in Washington is that a party generally waives the right to appeal an error unless there is an objection at trial." *Kalebaugh*, 183 Wn.2d at 583; *see* RAP 2.5(a). This rule "encourages parties to make timely objections, gives the trial judge an opportunity to address an issue before it becomes an error on appeal, and promotes the important policies of economy and finality." *Kalebaugh*, 183 Wn.2d at 583. In the context of jury instructions, CrR 6.15(c) provides that "[t]he court shall afford to counsel an opportunity in the absence of the jury to object to the giving of any instructions." However, RAP 2.5(a)(3) allows an appellant to raise an unpreserved "manifest error affecting a constitutional right" for the first time on appeal. In order to meet the criteria of RAP 2.5(a)(3), (1) the error must be "truly of a constitutional magnitude," and (2) the appellant must demonstrate that the alleged error is "manifest." *Kalebaugh*, 183 Wn.2d at 583.

Jury instructions that allegedly misstate reasonable doubt implicate a defendant's due process interests and are, therefore, of constitutional magnitude. *See id.* at 584. An error is "manifest" under RAP 2.5(a)(3) if the appellant shows actual prejudice from the

9

record. *Kalebaugh*, 183 Wn.2d at 584. "'To demonstrate actual prejudice, there must be a plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (alteration in original) (internal quotations marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99). In turn, "'whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error.'" *Id.* (quoting *O'Hara*, 167 Wn.2d at 100).

Here, the relevant portion of jury instruction 3 mirrors WPIC 4.01 and provides that "[a] reasonable doubt is one for which a reason exists." CP at 39. Mr. Belt's opening brief concedes that the Washington Supreme Court has directed trial courts to use WPIC 4.01 to instruct juries on the definition of reasonable doubt. *See* Br. of Appellant at 8; *see also Bennett*, 161 Wn.2d at 318 ("Trial courts are instructed to use the WPIC 4.01 instruction to inform the jury of the government's burden to prove every element of the charged crime beyond a reasonable doubt."); *accord State v. Castillo*, 150 Wn. App. 466, 468-69, 475, 208 P.3d 1201 (2009) (failure to use WPIC 4.01 is reversible error). Since trial courts are instructed to use WPIC 4.01, the alleged constitutional error based on such jury instruction is not "manifest" under RAP 2.5(a)(3). *See State v. Guzman Nunez*, 160 Wn. App. 150, 163, 248 P.3d 103 (2011) (asserted error not

"manifest" when "[t]he instruction used conformed, in material respects, to the pattern concluding instruction"), *aff'd in part by*, 174 Wn.2d 707, 285 P.3d 21 (2012).

Moreover, Mr. Belt's claimed manifest constitutional error is not even an *actual* error. Read in context, WPIC 4.01 "does not direct the jury to assign a reason for their doubts, but merely points out that their doubts must be based on reason, and not something vague or imaginary." *State v. Thompson*, 13 Wn. App. 1, 5, 533 P.2d 395 (1975). Defining a reasonable doubt as one for which "a reason exists" has been declared satisfactory in this jurisdiction for over 100 years. *See Thompson*, 13 Wn. App. at 5; *State v. Tanzymore*, 54 Wn.2d 290, 291, 340 P.2d 178 (1959); *State v. Harras*, 25 Wash. 416, 421, 65 P. 774 (1901). In *Kalebaugh*, the Washington Supreme Court recently reaffirmed that WPIC 4.01 is "the correct legal instruction on reasonable doubt." 183 Wn.2d at 586.

Mr. Belt has not established an actual error, let alone a practical and identifiable error that the trial court could have corrected despite Mr. Belt's failure to object to jury instruction 3. We conclude that jury instruction 3, which defines "reasonable doubt" as "one for which a reason exists," is not unconstitutional.

2.    *Unpreserved LFO error*

Whenever a person is convicted, the trial court "may order the payment

of a legal financial obligation" as part of the sentence.  RCW 9.94A.760(1); *accord*

RCW 10.01.160(1).  From the date of judgment, LFOs bear interest at a rate of

12 percent per annum.  *See* RCW 4.56.110(4); *see also* RCW 19.52.020(1).  Under

RCW 10.01.160(3), "the court shall take account of the financial resources of the

defendant and the nature of the burden that payment of costs will impose."  In other

words, "a trial court has a statutory obligation to make an individualized inquiry into a

defendant's current and future ability to pay before the court imposes LFOs."  *State v.*

*Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680 (2015).

Importantly, "the court must do more than sign a judgment and sentence with

boilerplate language stating that it engaged in the required inquiry."  *Id.* at 838.  "The

record must reflect that the trial court made an individualized inquiry into the defendant's

current and future ability to pay."  *Id.*  However, neither RCW 10.01.160 nor the

Washington Constitution "'requires a trial court to enter formal, specific findings

regarding a defendant's ability to pay [discretionary] court costs.'"  *State v. Lundy*, 176

Wn. App. 96, 105, 308 P.3d 755 (2013) (alteration in original) (quoting *State v. Curry*,

118 Wn.2d 911, 916, 829 P.2d 166 (1992)).

The court's individualized inquiry requires it to "consider important factors . . . such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay." *Blazina*, 182 Wn.2d at 838. Further, a court may also consider whether a defendant qualifies as indigent under GR 34, which takes into account whether the defendant "receives assistance from a needs-based, means-tested assistance program, such as Social Security or food stamps," or whether the defendant's "household income falls below 125 percent of the federal poverty guideline." *Blazina*, 182 Wn.2d at 838-39 ("if someone does meet the GR 34 standard for indigency, courts should seriously question that person's ability to pay LFOs"). "But *Blazina*'s reference to GR 34 does not change the law; it simply gives courts guidance when determining the individual's ability to pay LFOs." *In re Pers. Restraint of Flippo*, 191 Wn. App. 405, 411, 362 P.3d 1011 (2015).

Subject to three exceptions, RAP 2.5(a) provides that an "appellate court may refuse to review any claim of error which was not raised in the trial court." In *Blazina*, the Washington Supreme Court confirmed that an appellate court's discretion under RAP 2.5(a) extends to review of a trial court's imposition of discretionary LFOs. 182 Wn.2d at 830. However, "[a] defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review." *Id.* at 832.

13

"While such unpreserved LFO errors do not command review as a matter of right, each appellate court is entitled to 'make its own decision to accept discretionary review.'" *State v. Munoz-Rivera*, 190 Wn. App. 870, 895, 361 P.3d 182 (2015) (quoting *Blazina*, 182 Wn.2d at 835). One approach is to "consider the administrative burden and expense of bringing [a defendant] to a new sentencing hearing and the likelihood that the LFO result would change." *State v. Arredondo*, 190 Wn. App. 512, 538, 360 P.3d 920 (2015) ("An important consideration of this analysis is the dollar amount of discretionary LFOs imposed by the sentencing court."), *review granted*, No. 92389-2 (Wash. Apr. 29, 2016). Another approach would be to remand the issue to the trial court to make an individualized inquiry, as opposed to this court exercising its discretion to review whether the discretionary LFOs were properly imposed. *See Munoz-Rivera*, 190 Wn. App. at 895. A final approach would be to refuse to review or remand the alleged LFO error because the issue was not preserved below. *See State v. Duncan*, 180 Wn. App. 245, 253, 327 P.3d 699 (2014), *aff'd and remanded*, No. 90188-1, 2016 WL 1696698 (Wash. Apr. 28, 2016).

Here, the trial court imposed both mandatory and discretionary LFOs without conducting an individualized inquiry, but Mr. Belt failed to object. The $500.00 victim assessment, $200.00 criminal filing fee, $100.00 DNA collection fee, and $4,656.85 in

14

restitution apply irrespective of Mr. Belt's ability to pay. *See Lundy*, 176 Wn. App. at 102 ("For victim restitution, victim assessments, DNA fees, and criminal filing fees, the legislature has directed expressly that a defendant's ability to pay should not be taken into account."). However, the $750.00 in fees for Mr. Belt's court-appointed attorney was a discretionary LFO. *See Munoz-Rivera*, 190 Wn. App. at 894 (court-appointed attorney fees are discretionary). The discretionary LFOs equal only $750.00.

Mr. Belt contends that discretionary LFOs should not have been awarded because he qualified as indigent for purposes of his appeal. But the trial court's determination that Mr. Belt lacks the ability to pay for appellate counsel does not fully answer whether Mr. Belt has the current or future ability to pay a small discretionary LFO.

The State responds that if the matter were remanded, "Mr. Belt would have to be transported to Grant County to appear before the trial court, appointed a new public defender, take court and prosecutor time, and possibly file a new appeal." Br. of Resp't at 9. Although the trial court granted Mr. Belt's motion for indigency for purposes of appeal, his defense counsel referred to him as "able-bodied" during the sentencing hearing. RP (Dec. 16, 2014) at 6. Because the administrative cost of conducting a new hearing is high compared to the relatively small discretionary LFO award, and because Mr. Belt's physical ability to work suggests a remand would not accomplish a different

15

result, we exercise our discretion to not review this claimed error or to remand this issue

for a hearing. *See Arredondo*, 190 Wn. App. at 538.

3.    *Ineffective assistance of counsel*

Mr. Belt next argues that by not challenging the imposition of LFOs at sentencing,

his trial counsel provided ineffective assistance. A criminal defendant has the right under

the Sixth Amendment to the United States Constitution to effective assistance of counsel.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

> To demonstrate ineffective assistance of counsel, a defendant must
> make two showings: (1) defense counsel's representation was deficient, *i.e.*,
> it fell below an objective standard of reasonableness based on consideration
> of all the circumstances; and (2) defense counsel's deficient representation
> prejudiced the defendant, *i.e.*, there is a reasonable probability that, except
> for counsel's unprofessional errors, the result of the proceeding would have
> been different.

*State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a defendant fails

to satisfy either part of the test, this court need not inquire further. *State v. Hendrickson*,

129 Wn.2d 61, 78, 917 P.2d 563 (1996).

"There is a strong presumption that counsel have rendered adequate assistance and

made all significant decisions in the exercise of reasonably professional judgment such

that their conduct falls within the wide range of reasonable professional assistance."

*State v. Lord*, 117 Wn.2d 829, 883, 822 P.2d 177 (1991). If the attorney's conduct "can

be characterized as legitimate trial strategy or tactics," the conduct cannot be the basis of an ineffective assistance claim. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). To meet the prejudice prong, a defendant must show, "based on the record developed in the trial court, that the result of the proceeding would have been different but for counsel's deficient representation." *McFarland*, 127 Wn.2d at 337.

Here, Mr. Belt's defense counsel failed to object at the December 16, 2014 sentencing hearing when the trial court imposed the small discretionary LFO without conducting an individualized inquiry into Mr. Belt's ability to pay. As explained above, the record does not indicate that the able-bodied Mr. Belt would be unable to repay the $750 in discretionary LFOs. Because Mr. Belt cannot show prejudice, we conclude that Mr. Belt has not established his claim of ineffective assistance of counsel.

4.      *Statement of additional grounds for review*

For SAGs 1, 2, 3, 5, and 6, Mr. Belt asserts that both Ms. Johnson and Mr. Thompson testified falsely and committed perjury. Specifically, Mr. Belt argues that Ms. Johnson falsely testified that (1) she was on the phone with 911 when he was allegedly chasing her around the bar, but the 911 records do not reflect any such call being made, (2) it was only him and her in the bar during the beginning of the ordeal, even though she later told 911 that someone else had been stabbed, and (3) it would only take Mr.

17

Thompson three to four minutes to get to the bar when Mr. Thompson was coming from approximately 19 blocks away. Mr. Belt also argues that Mr. Thompson perjured himself by first testifying that he had a knife, and then immediately thereafter testifying that only Mr. Belt had a knife.

The fact that inconsequential details from a witness are contradicted or unbelievable does not mean that a jury was required to disbelieve the witness's entire testimony. For instance, (1) the absence of records establishing who Ms. Johnson called that night is inconsequential because the State was not required to establish these facts to convict Mr. Belt, (2) whether a third person was stabbed or not is inconsequential, given that the State only charged Mr. Belt with two counts of assault, and (3) many people cannot estimate distance or time accurately. As for Mr. Thompson's testimony, he testified that he grabbed the blade of the knife in self-defense and suffered cuts to his hands while doing so. It is very likely that Mr. Thompson's testimony—that the two men saw he "had the knife"—meant they saw he had control of the knife. If so, this is consistent with him grabbing the knife by the blade in self-defense. Regardless, these points raised by Mr. Belt in his SAG were all points defense counsel could raise in his closing argument.

18

This court does not address issues of witness credibility on appeal and instead defers to the jury's measure of witness credibility and resolution of conflicting testimony. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). Because the jury had a full opportunity to consider each witness's testimony, this court does not need to address these issues further.

5.      *Prosecutorial misconduct: leading question*

Mr. Belt's remaining SAG contends that the prosecutor asked Mr. Thompson a leading question to change his previous testimony that Mr. Thompson "had the knife." "In a prosecutorial misconduct claim, the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial." *Emery*, 174 Wn.2d at 756. "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. Here, the following questions and answers occurred between Mr. Thompson and the prosecutor:

> Q. —the two guys showed up?
>     Okay. When those two guys showed up, what did they do?
> A. Basically, they saw that—I believe they saw that I had the knife.
> I was pretty tired then. And, you know, we had been kind of doing this for
> quite some time, and I was exhausted. And so I was just hanging on.
>     Q. Okay.

19

> A. And they basically took him and I think they took the knife away from him and put him on the floor and held him down until the cops got there.
>
> Q. All right. I just want to be clear. *I thought you said earlier during this answer that you had a knife or is that inaccurate?*
>
> A. I never had a knife. I had a hold of the knife, the hand with the knife on it.

RP (Dec. 10, 2014) at 109 (emphasis added).

A leading question is one that suggests the answer desired. *State v. Scott*, 20 Wn.2d 696, 698-99, 149 P.2d 152 (1944). First, it is debatable whether the question emphasized above is a leading question. The question just as easily suggests a "yes" answer as it suggests a "no" answer. Second, Mr. Thompson's initial answer needed clarification, and it is not prosecutorial misconduct to have a witness clarify an answer. When asked to clarify his testimony, Mr. Thompson explained: "I never had a knife," but rather, "I had hold of the knife, the hand with the knife on it." RP (Dec. 10, 2014) at 109. As mentioned above, this clarification is consistent with Mr. Thompson having control of the knife by grabbing the blade with his hands. It also is consistent with the cuts he suffered to his fingers. We conclude that the question, even if leading, was proper and not prosecutorial misconduct because it allowed Mr. Thompson to clarify his ambiguous testimony.

No. 32974-7-III
*State v. Belt*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Lawrence-Berrey, J.

I CONCUR:

Fearing, C.J.

21

32974-7-III

SIDDOWAY, J. (concurring) — We construe Larry Belt's pro se "additional grounds

4" as contending that the prosecutor committed prosecutorial misconduct by asking a

leading question. Thus construed, I would reject the assignment of error out of hand.

"To prove prosecutorial misconduct, the Defendant must first establish that the

question posed by the prosecutor was improper." *State v. Stenson*, 132 Wn.2d 668, 722,

940 P.2d 1239 (1997). ER 611(c) provides that leading questions should not be used on

the direct examination of a witness "except as may be necessary to develop the witness'

testimony." And leading questions may always be used with a hostile witness, an adverse

witness, or a witness identified with an adverse witness. *Id.* The trial court has broad

discretion to permit leading questions. *Stevens v. Gordon*, 118 Wn. App. 43, 55, 74 P.3d

653 (2003). So a prosecutor who asks a leading question on direct examination that he or

she believes is consistent with these principles is not engaged in misconduct at all.

Here, Mr. Thompson had made a statement ("I believe they saw that I had the

knife") that was inconsistent with the remainder of his testimony. Report of Proceedings

(Dec. 10, 2014) at 109. The best way to clarify was to draw his attention to the

inconsistency and give him a chance to respond. Leading or not, there was nothing

No. 32974-7-III - concurrence
*State v. Belt*

improper about the prosecutor's question. I would not reach the issue of whether it was

flagrant, ill intentioned, and incurably prejudicial.

Siddoway, J.