IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 34761-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSE ABILIO AGUILAR AGUILAR, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Jose Abilio Aguilar Aguilar appeals his convictions

for first degree murder with one of two aggravating factors found by the jury and second

degree assault with a firearm. The trial court concluded that sufficient evidence

supported the egregious lack of remorse aggravator, but not the deliberate cruelty

aggravator, and imposed an exceptional sentence of 472 months.

Mr. Aguilar contends: (1) insufficient evidence supported a finding of

premeditation, a necessary element of first degree murder, (2) the State committed

governmental misconduct by delaying discovery and amending the charges multiple

times, improperly forcing him to choose between his constitutional speedy trial

right and his right to effective counsel, (3) the prosecutor committed misconduct, and

No. 34761-3-III
*State v. Aguilar*

(4) cumulative error requires reversal of his convictions. Mr. Aguilar also submitted a

statement of additional grounds for review in which he contends: (1) the trial court erred

by failing to provide a *Petrich*[1] instruction for the aggravating factors, and (2) the trial

court violated the real facts doctrine where it based its finding of egregious lack of

remorse on facts the State only argued supported the deliberate cruelty aggravator.

We affirm.

FACTS

*A.     Background Facts*

On October 16, 2012, a hunter discovered the body of Carmelita Lopez Santos in a

secluded wooded area approximately 100 yards from the Buckshot Wildlife Area parking

lot in Grant County, Washington.  Ms. Lopez had been shot multiple times in her face,

neck, and torso.  The medical examiner concluded that Ms. Lopez had suffered four pre-

mortem wounds: one to her left arm, one to her right cheek, one to her neck, and one that

penetrated her chest and exited her back.  She further concluded that any of the latter

three wounds could have caused Ms. Lopez's death.  The examiner also concluded that

Ms. Lopez suffered multiple post-mortem wounds.  Detectives found 12 spent shell

---

[1] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 406 n.1, 756 P.2d 105 (1988), *abrogated in part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588,

casings in the Buckshot parking lot and 5 more by Ms. Lopez's body.

A gate at the parking lot cut off vehicle access to a north-running service road, bordered to the west by a barbed wire fence. It had rained the night before October 16, and detectives found fresh shoe prints at the gate as well as a black spiked heel shoe. They discovered a matching shoe in sagebrush further down the dirt service road. The shoe prints continued from the gate and down the road toward the wooded area where the hunter discovered Ms. Lopez's body. The prints appeared fresh and some of the prints appeared to have been made by someone walking in a single spiked high-heeled shoe. Detectives also found grass that was stained red/brown near the gate and along the road, including near one of the high-heeled prints, and found a dark, heavily stained drag mark that ran from the barbed wire fence into the tree line.

In the days following the murder, Ms. Lopez's family members and friends received several telephone calls from her cell phone. On one occasion, the caller was aggressive and angry that people were calling the telephone. When Ms. Lopez's family offered to drive to the caller to pick up the phone and offered money for its return, the caller hung up. Later, the caller stated that Ms. Lopez's boyfriend in Mexico was asking him for money to release Ms. Lopez. He stated that Ms. Lopez's boyfriend said that Ms.

316 P.3d 1007 (2014).

Lopez was fine and with him in Mexico. The caller stated he would speak with the boyfriend demanding the money.

The State's investigation eventually focused on Jose Aguilar. Mr. Aguilar's housemate, Jose Galban Garcia, spoke at length with investigators. Mr. Aguilar and Ms. Lopez were in a relationship, but they broke up around May 2012. After May 2012, Mr. Aguilar told Mr. Galban he wanted to get back together with Ms. Lopez, and Mr. Galban heard Mr. Aguilar call her all the time. However, by October 2012, Ms. Lopez was engaged to another man.

On October 15, Mr. Aguilar told Mr. Galban he was going to see his girlfriend. When Mr. Galban saw Mr. Aguilar at their shared residence later that evening, he appeared drunk and nervous, and the shirt, jeans, and boots he was wearing appeared to have blood on them. Mr. Galban later saw a newspaper article about Ms. Lopez's murder and brought it to Mr. Aguilar's attention. According to Mr. Galban, Mr. Aguilar "laughingly told [him] that he was the one" responsible for Ms. Lopez's murder. Report of Proceedings (RP) (Apr. 14, 2016) at 2896.

Approximately two weeks later, Mr. Aguilar told Mr. Galban that he had taken Ms. Lopez to the Columbia River on October 15. In recounting the events of October 15, Mr. Aguilar indicated he told Ms. Lopez to get out of the car, and that he was going to kill

4

her, but she would not get out of the car. Mr. Aguilar also told Mr. Galban that Ms.

Lopez had asked him "what are you going to get out of this?" RP (Apr. 14, 2016) at

2902. Mr. Aguilar said he shot Ms. Lopez near his car, that she was still alive after that

initial shot, and that he took her "to the brush," where he covered her body with tree

branches. *Id.*

After this discussion, Mr. Aguilar insisted that he drive Mr. Galban to a store to

get more beer. The pair purchased two beers, and Mr. Aguilar drove Mr. Galban to an

irrigation pond. Mr. Aguilar was angry and regretted confessing the murder to Mr.

Galban. He became fearful that Mr. Galban would turn him in and pointed a gun at Mr.

Galban. Mr. Galban promised that he would not tell anyone about what Mr. Aguilar had

confessed. Mr. Aguilar decided not to shoot Mr. Galban and apologized to him.

Police arrested Mr. Aguilar on October 29, 2012. Law enforcement executed a

search of Mr. Aguilar's residence following his arrest. They recovered a 9 mm Smith and

Wesson from his bedroom, as well as two pairs of cowboy boots with a pair of socks

inside each. The gun was determined to be the same gun that fired the bullets and shell

casings found at the crime scene. The gun slide and grip contained deoxyribonucleic acid

(DNA) matching that of Ms. Lopez. One pair of boots tested positive for blood and DNA

consistent with Ms. Lopez's DNA and contained trace DNA consistent with Mr.

5

Aguilar's profile.  Additionally, a sock inside the boot contained a mixed DNA profile

consistent with both Ms. Lopez's profile and Mr. Aguilar's profile.  The police also

seized a bag containing what appeared to be a bloody shirt and jeans and a woman's purse

from Mr. Aguilar's detached garage.  However, those items were not tested until much

later.

Following Mr. Aguilar's arrest, a detective spoke with Mr. Aguilar while Ms.

Lopez's family members silently listened to the conversation on speakerphone.

Following the interview, Ms. Lopez's nephew immediately confirmed that Mr. Aguilar's

voice was the one he heard on the previous telephone calls.

### B.    *Procedural Facts*[2]

#### 1.    *2012-2013*

Mr. Aguilar was arraigned on November 6, 2012, on charges of first degree

murder, second degree assault, intimidating a witness, and alien in possession of a firearm

without an alien firearm license.[3]  The first three counts alleged Mr. Aguilar was armed

---

[2] Given the nature of Mr. Aguilar's claim on appeal that the State engaged in multiple instances of governmental misconduct and forced him to waive his right to a speedy trial, we detail at length the various continuances, charging amendments, and specific objections that occurred during the 41-month period between arraignment and trial.

[3] The victim for counts 2 and 3 was Mr. Galban.

with a firearm.

On November 27, 2012, and again on January 15, 2013, Mr. Aguilar continued his omnibus hearing due to voluminous discovery. He requested two additional continuances on January 23 and March 18. Mr. Aguilar indicated the second of these continuances was necessary because a CrR 3.5/3.6 suppression hearing was still needed, witness interviews still needed to be completed, and the defense was waiting on evidence that had not yet been returned from the Washington State Patrol Crime Laboratory.

The parties entered an omnibus order on June 25, 2013, setting trial for July 31, 2013. The order set July 12 as the final deadline for "any and all police reports, lab reports, experts the State intends to rely on at trial." Clerk's Papers (CP) at 1140. The order also set the suppression hearing for July 17. At that time, the State indicated it planned to amend the information by adding a kidnapping charge and an unidentified aggravator. The following day, the State provided written confirmation it had complied with the omnibus order and CrR 4.7(a) and provided the defense with all reports and statements it would use at trial.

On June 28, the State produced new evidence consisting of receipts and photographs of Mr. Aguilar that law enforcement found during the search of Mr. Aguilar's residence. Law enforcement placed the evidence in a storage locker and

7

prosecutors were unaware of its existence until examining the locker's contents in preparation for trial.

At a status hearing on July 16, Mr. Aguilar's counsel raised concerns about the evidence disclosed by the State on June 28 and the witness list provided by the State, which included new names and did not provide indications as to what each of the witnesses would testify about. Mr. Aguilar's counsel requested a trial continuance to go over the new evidence with Mr. Aguilar, to re-interview some witnesses if necessary, and to allow the parties to postpone the suppression hearing so that all issues could be heard at one time. He did not assert his speedy trial right at that time. The court expressed frustration with law enforcement's failure to turn over evidence and the difficulty it presents to defense counsel, but granted the continuance, moving the trial date to October 2.

At that same hearing, the court also heard the State's motion to amend the information. Mr. Aguilar objected, arguing that the State had all the information it was relying on to amend as of November 2012, and the case was supposed to go to trial only two weeks later. His counsel did note that the continuance of the trial date to October diluted his argument considerably. That same day, the State filed an amended information adding a count of first degree kidnapping and amending count 1 from first

degree murder while armed with a firearm to premeditated felony murder, predicated on kidnapping, with aggravating circumstances of deliberate cruelty and lack of remorse.

On August 21, 2013, Mr. Aguilar filed a motion for a bill of particulars and a motion to dismiss counts 1 and 2 based on insufficient evidence pursuant to CrR 8.3(c) and *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

On September 5, hearings began on Mr. Aguilar's suppression issues, including the voluntariness of his statements to law enforcement and issues concerning various pieces of evidence. The issues could not be heard in the single day allotted, requiring special setting. The continued hearings ultimately spanned a period of over two years from September 11, 2013 through August 4, 2015.

On September 18, the State moved for a trial continuance due to unresolved pretrial issues, including the admissibility of Mr. Aguilar's custodial statements. Mr. Aguilar agreed to the continuance of 60 days to December 4, 2013.

The court heard the CrR 3.5 and 3.6 motions on November 21, 2013. The court considered the voluntariness of Mr. Aguilar's statement and the search-related suppression issues. The court denied the motion to suppress evidence seized in a pre-warrant search but reserved ruling on the admissibility of Mr. Aguilar's statement. Five days later, Mr. Aguilar continued the trial for four months, from December 4, 2013, to a

9

readiness date of March 31, 2014.

### 2.    *2014*

The State filed a second amended information on February 4, 2014, adding drive-by shooting as an additional basis for aggravated first degree murder. Mr. Aguilar made an oral objection, contending it was improper for the State to make this amendment before the court had ruled on his motion to dismiss counts 1 and 2 for insufficient evidence. Mr. Aguilar also argued that the State's motion to amend the information should be denied pursuant to CrR 8.3(b) and claimed the amendment would force him to choose between his right to effective counsel and his constitutional speedy trial rights. The court concluded that Mr. Aguilar failed to demonstrate why the new aggravator would necessarily result in a lengthy delay, overruled Mr. Aguilar's objection, and granted the motion to amend. The court subsequently denied Mr. Aguilar's motion to dismiss for insufficient evidence pursuant to CrR 8.3(c).

On or about March 31, 2014, the parties submitted a joint request to continue the March 31 readiness date to September 2, 2014. Defense counsel needed a continuance because he had obtained a new investigator and was considering retaining experts.

On July 28, the parties agreed to continue the readiness hearing to October 6. On September 15, the parties requested a January 2015 "hard set" for trial. CP at 1222. The

10

court indicated it did not have authority to hard set matters, but set the readiness hearing for January 5, 2015.

### 3.    2015

On January 5, the deputy prosecutor indicated that due to the newly elected prosecutor taking office, he would be leaving his job and a new deputy would take over Mr. Aguilar's case. Readiness was continued to March 30, 2015, to allow the new deputy prosecutor to prepare.

On March 3, the parties entered a stipulated order continuing readiness to June 1. On May 12, Mr. Aguilar requested a continuance of the readiness hearing to August 3, indicating that evidence was being tested, there was lots of discovery to go through, and the need for additional funds for his crime scene expert. On August 3, the parties asked for a two-week continuance based on the unavailability of witnesses.

On August 14, the State produced three pages of notes from the new prosecutor's August 13 follow-up interview of Mr. Galban, the alleged victim in the second degree assault and witness intimidation charges. Those notes contain previously undisclosed details about Mr. Aguilar's admissions about killing Ms. Lopez and threats against Mr. Galban. At a hearing on August 17, Mr. Aguilar's counsel indicated he was not ready for trial due to this new evidence and noted that the parties agreed to continue the trial but

disagreed as to the length of the continuance: Mr. Aguilar wanted to continue the trial to

September 16 while the State wanted to continue the trial to October 7. Due to a variety

of scheduling issues and court congestion, the court continued the trial to October 7,

2015.

On September 21, the State renewed its motion for a hard set trial date, which the

court denied. At a hearing on September 22, the State notified the court that it was

analyzing additional DNA evidence and that the crime laboratory was trying to complete

the testing before the October 7 trial date.

At a review hearing on September 29, the State told the court it was unsure the

crime laboratory would complete the supplemental DNA testing in time for the

October 7 trial. On October 2, defense counsel indicated that October 7 was the earliest

he could schedule Mr. Galban's interview due to difficulties coordinating with all the

necessary parties, including an interpreter. The State moved to continue the trial from

October 7 to October 14, and the court reset the trial date.

At the October 12 readiness hearing, both sides indicated they were ready. The

State filed its third amended information, removing the charge of felony murder

committed in the course of a kidnapping and the drive-by shooting aggravator. The State

added an alternative charge of second degree murder, armed with a firearm, alleging the

same aggravating circumstances alleged in count 1: deliberate cruelty and egregious lack of remorse.  Mr. Aguilar did not object to the amendments, waived formal reading, and entered not guilty pleas to all counts.

The following day, the State requested a continuance on the basis that the county e-mail server had gone down over the weekend and was still not restored, making it difficult to schedule witnesses.  The prosecutor also raised concerns that the trial might run into his previously scheduled vacation.  He asked the court to continue the trial to December 2.  Mr. Aguilar's counsel indicated that he was not going to object to a one-week continuance, that he was not contesting there was good cause for a continuance of a reasonable length, and that he deferred to the court as to the length of the continuance.

On October 14, the State resubmitted the shirt, jeans, and purse found in Mr. Aguilar's garage to the crime laboratory for DNA testing.[4]

---

[4] The State indicated during oral argument that it only realized the significance of the clothing in September 2015 when Mr. Galban indicated for the first time that Mr. Aguilar spent the night of the murder in the garage.  However, on September 5, 2013, the State filed a response to Mr. Aguilar's motion for a bill of particulars, summarizing the State's evidence and stating in part, "Mr. Galban-Garcia sees the Defendant return home with his shirt covered in blood.  The Defendant is behaving erratically and sleeps in the garage (something that Mr. Galban-Garcia has never seen him do before)."  CP at 159.  It,

The shirt, jeans, and purse were first submitted to the crime laboratory in 2012

with the other evidence seized at Mr. Aguilar's residence in 2012. However, the

laboratory did not test them at that time. According to the laboratory scientist who

processed the items from Mr. Aguilar's residence, crime laboratory policies initially limit

evidence in large cases to five crime scene samples determined to be the most relevant.

She tested the items found in Mr. Aguilar's residence and found DNA from both Mr.

Aguilar and Ms. Lopez on them. Because of this, she returned the untested items found

in the garage.[5]

On October 20, Mr. Aguilar requested a trial continuance to January 6, 2016, based

on his lead investigator's unavailability for part of December. The court granted the

continuance, adjusting the trial date to January 6, 2016.

At a status hearing on December 15, the State informed the court it had just

received the additional DNA results, which it forwarded to Mr. Aguilar's counsel that

same day. The results indicated that the laboratory found mixed DNA profiles containing

DNA from both Ms. Lopez and Mr. Aguilar on both the shirt and the jeans, and DNA

from Ms. Lopez on the purse. At that same hearing, the State noted that it filed an

therefore, appears that the State had notice of this information as early as September 13.

[5] Mr. Aguilar's DNA expert had the shirt and jeans for testing from March 5, 2015, through August 13, 2015, but did not test them for DNA evidence.

14

updated witness list indicating that a previously identified witness, Jorge Reyes, had telephone records the State planned to introduce as evidence. Mr. Reyes told law enforcement early in the investigation that he had received telephone calls from Ms. Lopez's telephone following her death, and the records supported Mr. Reyes's earlier statement. At this hearing, Mr. Aguilar's counsel noted that the DNA results were significant, and defense's expert needed to review the bench notes and lab photographs they were still waiting on. He indicated that if they received the materials soon, they would be ready for trial on January 6, and that they did not want to request a continuance at that time.

On December 21, the State produced the telephone records for Mr. Reyes. That same day, Mr. Aguilar filed a CrR 8.3 motion to dismiss the charges against him or suppress the new DNA test results and Mr. Reyes's telephone records. He claimed that the State committed governmental misconduct by waiting so long to conduct the DNA testing or obtain the telephone records when the evidence had been within the State's possession and control since the fall of 2012, and the State did not explain the delay. He also contended that he would require a two-month continuance for a new expert to review the DNA evidence and, accordingly, the State's delay in producing the evidence would force him to choose between his speedy trial right and his right to effective counsel. The

15

next day, Mr. Aguilar filed a motion for a new expert. At the initial hearing on the

motions on December 29, Mr. Aguilar's counsel argued the new DNA evidence was

"very, very damaging." 5 RP (December 29, 2015) at 723.

### 4. 2016

The court heard Mr. Aguilar's CrR 8.3(b) motion on January 4, 2016. Mr.

Aguilar's counsel claimed that Mr. Aguilar never waived his speedy trial rights because

his refusal to sign orders "on three or four occasions" indicated he opposed those

continuances. 5 RP (Jan. 4, 2016) at 735. However, counsel confirmed Mr. Aguilar

made no written objections and nothing had been said on the record indicating an

objection. The court noted that 10 of the 14 trial continuances to date had been jointly

made or made at Mr. Aguilar's request, that Mr. Aguilar requested the most recent

continuance on October 22, and that he had not formally objected to a continuance. The

court further noted that they were currently past the outside date for speedy trial and "the

evidence, in the administration of justice, I think, is necessary to have a full trial." *Id.* at

750. The court held that the facts of the case did not warrant the extraordinary remedy of

dismissal and denied the motion, but noted that the court was willing to grant a two-

month trial continuance to March 9 to prevent prejudice to the defense.[6]

On January 26, 2016, the State requested a trial date continuance from March 9 to March 23 because the lead detective had a preplanned vacation with nonrefundable tickets. Mr. Aguilar objected that this should have been taken into account when the trial was reset three weeks prior. The court noted the situation was unfortunate but found good cause to continue the trial. At hearings on March 14 and 18, the parties discussed scheduling issues related to the length and complexity of the case in light of other cases on the court's docket.

### C. Trial

Trial commenced on March 30, 2016, and continued through April 21. Two weeks into trial and prior to resting, the State moved to amend the dates in the third amended information to conform to the evidence. In the third amended information, count 1 (first degree murder) was identified as occurring from October 1-16, 2012, count 2 (second degree murder) occurred on October 1, 2012, count 3 (second degree assault) was identified as occurring from October 1-16, 2012, count 4 (intimidating a witness) was alleged to have occurred on October 29, 2012, and count 5 (alien in possession of a

---

[6] Either the trial court did not enter written findings and conclusions with respect to this decision, or the parties failed to include the written order in the record on appeal. In any event, neither party raises the absence of a written ruling on this motion.

firearm) occurred on October 29, 2012. The State moved to amend the dates as follows: October 15-16, 2012, for counts 1 and 2, October 16-28, 2012, for count 3, October 16-28, 2012, for count 4, and October 15-29, 2012, for count 5.

Mr. Aguilar objected to the amendment of counts 3, 4, and 5, but later withdrew his objection as to count 5. He asserted unfair surprise and prejudice on the basis that State was broadening the time frame into areas the defense did not investigate, compromising his ability to assert an alibi defense or attack Mr. Galban's credibility on the basis of the dates of the charges. He did not object to the amendments on CrR 8.3(b) grounds or request a continuance. After noting that the original dates appeared to contain a scrivener's error to the extent they charged threatening a witness occurred prior to the murder, the court ultimately concluded Mr. Aguilar had failed to demonstrate any prejudice.

After the State rested, the court granted Mr. Aguilar's motion to dismiss count 5 (alien in possession of firearm without a license) for insufficient evidence. At that time, Mr. Aguilar filed a mid-trial motion to dismiss the aggravating factors of deliberate cruelty and egregious lack of remorse for insufficient evidence, which the court denied.

During closing arguments, the State made the following comments about the aggravating factors of deliberate cruelty and egregious lack of remorse:

18

Okay. Instruction 28 deals with egregious lack of remorse by the defendant's word and conduct. The state concedes there's not a lot— there's no evidence about what happened to all this thing, except these facts that we know—excuse me, that the evidence came in about. And that was that the defendant and the victim were going down the roadway, about 75 yards before she was shot, dragging her over to the other area, through the barbed wire fence, under the barbed wire fence, leaving her there and shooting her a few more times, then telling Mr. Galban afterwards, just the comment, ha, ha, ha, you know, I killed her. A complete lack of remorse.

Deliberate cruelty. We believe the state has established this element of the crime. Shooting somebody with a gun necessarily probably would be considered in our society—maybe that's not too violent. However, based upon what I've just talked about or what the state has talked about already to this point, it's the state's position that we have established the deliberate cruelty element with regard to this charge, as well, based upon the defendant's actions towards the victim.

RP (Apr. 19, 2016) at 3348-49. During the State's rebuttal closing argument, the

prosecutor further stated:

I think the first thing that needs to be said is with regard to this issue of deliberate cruelty, the state's evidence in that regard shows that Carmelita Lopez was marched to her death; that she was forced out of the car, lost a shoe. Who would walk with—who would walk down a roadway 75 yards at night after losing their shoe? The person would stop, put their shoe back on. She knew she wasn't coming back from losing her shoe to retrieve it. Even if she said—even if she said stop, I want to put my shoe on.

It's not serious, it's not serious to say that these shoes recovered at the scene were not her shoes. The photographs that were presented in the case showed that she was laying there dead and barefoot, and these two high heel shoes were found at the scene.

Counsel didn't talk about the other part about it is the emotional component of deliberate cruelty. This isn't a case where she was just shot in the back, wasn't expecting to get shot in the back. This is a case where she was marched, drug, whatever, with a man with a gun, with the

19

> defendant with a gun in his hand, shot, knocked down. Nobody was there. The blood evidence shows that someone was shot in this location, and further down another blood spot, and then this drag mark off into the brush.
>
> How long that took place, no one knows. Common sense would indicate that wasn't just a (snaps fingers) quick process. Deliberate cruelty comes out in the form of calling family members on the phone after he's killed her and talking to her from—talking to them from her cell phone. Even suggesting to them that they pay money and they can get the phone back.

RP (Apr. 20, 2016) at 3418-19.

The jury found Mr. Aguilar guilty of first degree murder with a firearm and second degree assault with a firearm. The jury answered yes to both of the special verdicts for the aggravating factors of egregious lack of remorse and deliberate cruelty. The court dismissed the conviction for intimidating a witness due to its double jeopardy overlap with the assault conviction.

### D.     *Posttrial Facts Relevant to SAG Arguments*

Mr. Aguilar filed a posttrial motion to vacate the jury verdicts. As part of that motion, he argued that the court should dismiss the aggravating factors because the court erred by failing to provide a *Petrich* instruction that the jury had to unanimous as to which underlying facts supported the aggravating factors. The court concluded that *Petrich* was not implicated because the evidence supporting the aggravating facts was "just the facts of the case" such that the jury did not have to be unanimous, and denied the motion.

20

RP (July 1, 2016) at 3491.

At the sentencing hearing, the court acknowledged that the State had apparently switched the acts it relied on to support the two aggravators during closing argument and did not reference the telephone calls as evidence of lack of remorse. The court concluded that the switching of these facts during closing argument did not result in a situation where the court could not impose the aggravating factors. After concluding that the evidence in the record was insufficient to support the deliberate cruelty finding, the court held that the lack of remorse aggravator was supported by the telephone calls made to Ms. Lopez's friends and family. The court imposed an exceptional sentence of 472 months based on egregious lack of remorse.

Mr. Aguilar appeals.

ANALYSIS

A.      *Sufficient Evidence to Sustain Conviction for First Degree Murder*

Mr. Aguilar contends the evidence did not support the premeditation element of his conviction for first degree murder, claiming the State's case for premeditation is purely speculative. Evidence is sufficient if, when viewed in the light most favorable to the State, it permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Tilton*, 149 Wn.2d 775, 786, 72 P.3d 735 (2003)

(quoting *State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993)). Courts must draw all reasonable inferences from the evidence in favor of the State and interpret the evidence most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence receives the same weight as direct evidence. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). Appellate courts defer to the fact finder on the resolution of conflicting testimony, credibility determinations, and the persuasiveness of the evidence. *Id.* at 874-75.

The premeditated intent to cause the death of another is an essential element of the crime of first degree murder. *State v. Hummel*, 196 Wn. App. 329, 354, 383 P.3d 592 (2016); RCW 9A.32.030(1)(a). Premeditation requires a "deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991). "Premeditation may be proved by circumstantial evidence if substantial evidence supports the jury's finding and inferences from the facts are reasonable." *State v. Barajas*, 143 Wn. App. 24, 36, 177 P.3d 106 (2007).

While the mere opportunity to deliberate is not sufficient to support a finding of premeditation, a wide range of facts may support the inference of premeditation. *State v.*

*Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999).  Factors relevant to establish

premeditation include motive, procurement of a weapon, stealth, and method of killing.

*State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995).  Circumstantial evidence that

the defendant brought a weapon to the scene and fired multiple shots supports the

reasonable inference of premeditation.  *See Hoffman*, 116 Wn.2d at 83.

Here, sufficient evidence of premeditation can be inferred from the facts when

viewed in the light most favorable to the State.  The evidence establishes that Mr. Aguilar

had a motive to kill Ms. Lopez—he was upset that they were no longer together, he

wanted to resume their relationship, and she was involved with another man.  The

evidence also establishes that Mr. Aguilar took Ms. Lopez to a secluded area while armed

with a handgun.  This evidence of stealth supports an inference of premeditation.

Mr. Aguilar also had time to reflect on his actions before killing Ms. Lopez.  Mr.

Galban testified that Mr. Aguilar told him that after driving Ms. Lopez to the Buckshot

parking lot, he told her to get out of the car, but she refused.  He then told her that he was

going to kill her, and she attempted to reason with Mr. Aguilar, asking him "what are you

going to get out of this?"  RP (Apr. 14, 2016) at 2902.  Mr. Aguilar also told Mr. Galban

23

that Ms. Lopez was alive after the initial shot.[7] This evidence not only demonstrates an opportunity to deliberate, but allows a reasonable inference that Mr. Aguilar did, in fact, reflect on his actions before killing Ms. Lopez.

Finally, Mr. Aguilar's lengthy and excessive attack provides evidence of premeditation. The crime scene evidence indicated that Ms. Lopez was initially shot near the gate to the parking lot, she then walked approximately 50 to 75 yards down the service road in one high heel, and was subsequently shot multiple more times before being dragged off the road. Although Mr. Aguilar claims the State's version of events is entirely speculative in the absence of any eyewitness testimony, it is supported by the crime scene evidence.

Contrary to Mr. Aguilar's arguments, the facts of this case are distinguishable from *Hummel*, 196 Wn. App. at 354, and *State v. Bingham*, 105 Wn.2d 820, 826, 719 P.2d 109 (1986). In *Hummel*, the victim disappeared several days after her child disclosed that the defendant had been sexually molesting her, and the defendant later admitted to disposing of the victim's body. 196 Wn. App. at 356. Division One of this court held that where

---

[7] Mr. Aguilar contends that Mr. Galban's testimony was not credible because he received a "U visa" as a crime victim in exchange for his testimony that Mr. Aguilar assaulted and threatened him. Appellant's Br. at 12. However, this court will not reweigh the credibility of witnesses. *State v. Arredondo*, 190 Wn. App. 512, 527, 360 P.3d 920 (2015), *aff'd*, 188 Wn.2d 244, 394 P.3d 348 (2017).

there was no evidence that the defendant knew the child had disclosed the abuse or that the victim confronted the defendant prior to her death, and there was no evidence suggesting deliberation or reflection with respect to the manner in which the victim died, the evidence did not support an inference of premeditation. *Id.* at 356-57.

In *Bingham*, the State argued the defendant acted with premeditated intent where he killed the victim by manual strangulation and the evidence showed it would have taken approximately three to five minutes for the victim to die. 105 Wn.2d at 824. The Washington Supreme Court rejected this argument, holding that the mere fact that the method of killing would have taken an appreciable amount of time in which the defendant could have deliberated, without any other indicators of premeditation, is not enough to support a reasonable inference of premeditation. *Id.* at 827-28.

In both of those cases, the State attempted to rely on a single factor from which a jury might infer premeditation and the inference was simply too tenuous. In contrast, here the State presented evidence of motive, stealth, a method of killing indicating deliberation, and a lengthy and excessive attack. There was sufficient evidence for a reasonable jury to find premeditation.

B.      *"Right to a Speedy and Fair Trial" Argument Waived*

Mr. Aguilar contends the State's mismanagement of the evidence and multiple

25

amendments of the charges without good cause led to a lengthy delay in trial, and improperly forced Mr. Aguilar, on several occasions, to choose between his speedy trial rights and his right to effective assistance of counsel. He claims that the State's actions constituted governmental misconduct under *State v. Brooks*, 149 Wn. App. 373, 203 P.3d 397 (2009) and *State v. Michielli*, 132 Wn.2d 229, 937 P.2d 587 (1997), and that this misconduct forced him to waive his constitutional speedy trial rights to ensure his counsel was adequately prepared, requiring reversal and dismissal of the charges.

A trial court may dismiss charges under CrR 8.3(b) if the defendant shows by a preponderance of the evidence (1) arbitrary action or governmental misconduct and (2) prejudice materially affecting the defendant's right to a fair trial. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). Governmental misconduct need not be evil or dishonest—simple mismanagement is sufficient. *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993). Governmental misconduct can include a violation of CrR 4.7 discovery rules. *Brooks*, 149 Wn. App. at 382-83. However, the defendant must show actual prejudice, not merely speculative prejudice, affected his right to a fair trial. *Rohrich*, 149 Wn.2d at 657. A defendant is prejudiced where the "interjection of new facts into the case when the State has not acted with due diligence will compel him to choose between prejudicing" either his right to speedy trial or his right to effective

26

counsel. *State v. Price*, 94 Wn.2d 810, 814, 620 P.2d 994 (1980).

Dismissing charges under CrR 8.3(b) is an extraordinary remedy that is limited to truly egregious cases of mismanagement. *Rohrich*, 149 Wn.2d at 658; *State v. Wilson*, 149 Wn.2d 1, 9, 65 P.3d 657 (2003). This court reviews the trial court's decision to deny a motion to dismiss under CrR 8.3(b) for abuse of discretion; that is, whether the decision was manifestly unreasonable, based on untenable grounds, or made for untenable reasons. *Blackwell*, 120 Wn.2d at 830.

On only one occasion below did Mr. Aguilar assert that State mismanagement required dismissal of charges pursuant to CrR 8.3(b). On December 21, 2015, Mr. Aguilar filed a CrR 8.3(b) motion to dismiss the charges or suppress the new DNA evidence and Mr. Reyes's telephone records. In that motion, he challenged the late production of the DNA evidence and Mr. Reyes's telephone records but did not allege any other misconduct by the State. In contrast, here Mr. Aguilar claims that the State's various charging amendments and multiple discovery delays throughout the 41-month period between arraignment and trial constituted governmental mismanagement.

This court does not consider an argument raised for the first time on appeal unless it is a manifest error affecting a constitutional right. RAP 2.5(a)(3); *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). The burden is on the defendant to make

27

the required showing. *State v. McDonald*, 138 Wn.2d 680, 691, 981 P.2d 443 (1999).

The defendant must make a "'plausible showing'" that the asserted error had "'practical

and identifiable consequences in the trial of the case.'" *State v. O'Hara*, 167 Wn.2d 91,

99, 217 P.3d 756 (2009) (internal quotation marks omitted) (quoting *State v. Kirkman*,

159 Wn.2d 918, 935, 155 P.3d 125 (2007)). "[T]o determine whether an error is practical

and identifiable, the appellate court must place itself in the shoes of the trial court to

ascertain whether, given what the trial court knew at that time, the court could have

corrected the error." *Id.* at 100. If the error was obvious and correctable, it is manifest.

*See State v. Kalebaugh*, 183 Wn.2d 578, 584-85, 355 P.3d 253 (2015).

Here, Mr. Aguilar does not argue on appeal that the trial court committed a

manifest constitutional error. Nor can we say that the asserted constitutional error was

obvious at any point in the proceedings below. For instance, when ruling on Mr.

Aguilar's December 2015 request for dismissal of the charges, the trial court noted that

10 of the 14 trial continuances had been jointly made or made at Mr. Aguilar's request,

and that Mr. Aguilar had not objected to any continuance before his December 2015

motion. In addition, Mr. Aguilar's own motions spanned from September 11, 2013

through August 4, 2015, much of the time he now attributes to the State's delay and

mismanagement. Placing ourselves in the shoes of the trial court, the asserted

constitutional error was not obvious. Thus, Mr. Aguilar's claim is not a manifest constitutional error and may not be asserted for the first time on appeal.

### C. *Purported Prosecutorial Misconduct*

Mr. Aguilar contends the prosecutor committed misconduct on several grounds. We address each ground separately below.

To demonstrate prosecutorial misconduct, the defendant has the burden of establishing that (1) the State acted improperly, and (2) the State's improper act resulted in prejudice that had a substantial likelihood of affecting the verdict. *State v. Emery*, 174 Wn.2d 741, 759-61, 278 P.3d 653 (2012). However, a defendant who fails to object to the State's improper act at trial waives any error, unless the act was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). In making that determination, the courts "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762. Arguments that have an "inflammatory effect" on the jury are generally not curable by a jury instruction. *Id.* at 763 (quoting *State v. Perry*, 24 Wn.2d 764, 770, 167 P.2d 173 (1946)).

This court reviews a prosecutor's purportedly improper remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury. *State v. Gregory*, 158 Wn.2d 759, 810, 147 P.3d 1201 (2006). Where defense counsel objected to a prosecutor's remarks at trial, this court reviews the trial court's rulings for abuse of discretion. *Id.* at 809.

### 1. Personal Beliefs of Prosecutor

Mr. Aguilar contends the prosecutor improperly injected his personal beliefs into the case by stating, "I believe" and "we believe" during closing argument.

A prosecutor cannot express a personal opinion as to a defendant's guilt or a witness's credibility, independent of the evidence actually in the case. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014); *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011) (prosecutor who throws "'expression of his own belief of guilt into the scales against the accused'" deprives the defendant of the constitutional right to a fair trial) (internal quotation marks omitted) (quoting *State v. Case*, 49 Wn.2d 66, 71, 298 P.2d 500 (1956)). However, "prosecutors may argue inferences from the evidence, including inferences as to why the jury would want to believe one witness over another." *State v. Copeland*, 130 Wn.2d 244, 290, 922 P.2d 1304 (1996). When determining whether a prosecutor improperly expressed a personal opinion or vouched for a witness's

credibility, the reviewing court looks at the entire argument in context.  *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983) (noting that "[p]rejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion").

At the beginning of closing argument, the prosecutor said: "It's the state's position, obviously, *that we believe* that the evidence in this case clearly demonstrated that the defendant, Jose Aguilar, who sits here, executed Carmelita Lopez the night of October 15th, 2012, at the Buckshot Wildlife Recreation Area . . . .  I think it's important that we discuss certain key pieces of evidence *that we believe* supports that clearly," and stated he was going to "point out things *that we believe* that are beyond reproach in this case."  RP (Apr. 19, 2016) at 3323 (emphasis added).  Defense counsel objected to counsel referring to his belief, and the court instructed the prosecutor to use "the state's position" instead.  *Id.* at 3324.

The prosecutor continued to use the phrases "I believe," "we believe," or "we know" throughout closing argument.  When discussing evidence found in Mr. Aguilar's bedroom, he stated, "his identification, I believe, from Honduras."  *Id.* at 3332.  He then stated "we know that Carmelita Lopez was murdered sometime the night of October the 15th,  Monday, October 15th.  We know that she left work in Yakima" and defense again

31

objected. *Id.* at 3335. The court overruled, holding the jury understood that this was the

State's position as to what the evidence supports. The prosecutor used the phrase "I

think" when discussing the statistical probabilities related to the DNA evidence, and Mr.

Aguilar's objection was again overruled. He referred to what "we believe" the evidence

has demonstrated, and said that "I believe [the medical examiner] testified to four, five

more shots that were 'post-mortem.'" *Id.* at 3344. During the to convict instruction, the

prosecutor stated:

> We believe . . . Carmelita Lopez died as a result of defendant's act, and the
> act occurred in Washington, we believe have been proved. We believe also
> that this happened between the 15th and 16th of October, and we believe
> that item number three, the intent to cause death was premeditated.

*Id.* at 3346-47. The court did sustain Mr. Aguilar's objection to the prosecutor's

statement that "We believe the defendant is guilty of [second degree murder] as well." *Id.*

at 3347.

During the State's rebuttal closing arguments, the prosecutor stated, "The first

thing that needs to be said, that both [defense counsel] and I use the word 'I' when we're

referring to the case. The point is that it's not—as Judge Antosz told you, it's not what I

think or what he thinks, he pointed out very clearly, it's what the evidence has shown in

the case. I meant no disrespect or anything else about that during my earlier

presentation." RP (Apr. 20, 2016) at 3417-18.

32

Washington courts have declined to find misconduct based on "I/we know" or "I/we believe" statements where the record demonstrates the prosecutor used the phrase to refer to evidence already admitted in trial and argue inferences that may be drawn from that evidence, rather than to express a personal opinion as to the defendant's guilt or a witness's credibility. *See e.g.*, *State v. Robinson*, 189 Wn. App. 877, 894-95, 359 P.3d 874 (2015) (prosecutor's use of the phrase "we know" was not improper vouching where the phrase was used to marshal the evidence actually presented at trial); *Hoffman*, 116 Wn.2d at 93-94 (prosecutor's use of phrases "I think" and "I think the evidence shows" is not misconduct where the statements contained material supported by the evidence). Such phrasing is more problematic where it is used to suggest the government has special knowledge of evidence not presented to the jury. *See e.g.*, *United States v. Bentley*, 561 F.3d 803, 812 (8th Cir. 2009).

Similar to *Robinson* and *Hoffman*, the prosecutor here repeatedly used the terms "we believe," "we think," and "we know" to refer to evidence admitted during trial and to argue the ultimate facts and conclusions the jury could draw from that evidence. These comments were not expressions of personal belief, with the exception of the one statement that "we believe the defendant is guilty." The court properly sustained the objection to that statement. Moreover, the prosecutor followed up these statements with a

curing statement that his use of these phrases was intended to refer to what the evidence

showed, not his personal beliefs. Mr. Aguilar has failed to demonstrate any misconduct

or any resulting prejudice from the prosecutor's less than artful language during closing

argument.

2.      *Voir Dire Comments*

Mr. Aguilar also contends the prosecutor improperly stated the jury needed to trust

him during voir dire by asking the jurors whether they could trust what was said by the

State, defense counsel, and the court. He contends this improper argument set the stage

for the prosecutor's improper expressions of personal belief during closing argument.

A prosecutor has an obligation to see that the defendant is accorded procedural

justice and that guilt is decided upon the basis of sufficient evidence. *State v. Pierce*, 169

Wn. App. 533, 558, 280 P.3d 1158 (2012) (quoting RPC 3.8, cmt. 1). It is improper for a

prosecutor to encourage a verdict based on trust or other emotion. *State v. Belgarde*, 110

Wn.2d 504, 507-08, 755 P.2d 174 (1988).

During voir dire, the prosecutor raised the issue of trust and generally asked the

potential jurors how long they need to know someone before they can trust that person.

He then said, "we hope that you can trust what I'm telling you and what [defense counsel]

is telling you or what the court's telling you. You have no relationship with us before you

34

came in here today. So odds are we're not going to be—you're not going to trust any of us right now. That's going to take some time to develop or earn trust." RP (Mar. 31, 2016) at 799. One juror stated that the concept of "[t]rusting anybody in the room would not seem to me to be fair to the defendant." *Id.* at 800. The prosecutor clarified, explaining that some people might say "I don't trust a thing that lawyer is saying, his lips are moving," and that he would be concerned about a juror who did not believe anything the lawyers were saying based on preconceived notions of attorneys. *Id.* at 803. Another panel member asked "your function here is to make—to prosecute him and to get us to believe what you have to say. Am I not correct?" *Id.* at 804. At that point, the prosecutor took the opportunity to clarify that the State's obligation is to present the evidence it has from the witnesses and explain why the State believes it is right about "our claim." *Id.* at 805.

If the prosecutor had told the potential jurors to trust him, and him alone, this line of questioning would constitute misconduct. However, the prosecutor specifically asked the jury panel whether they would be willing to trust not only himself, but also the court and defense counsel. Moreover, he clarified that his goal was not simply to try to get the jury to believe him, as some of the panel members believed, but instead to present all of the State's evidence and to explain why the State believed that evidence supported the

State's theory of the case. When these comments are viewed in the context of the entire line of questioning, they appear to be permissible statements intended to identify any potential jurors whose objectivity might be affected by their general attitudes toward attorneys. The comments do not constitute prosecutorial misconduct.

### 3. Opening Statement

Mr. Aguilar next contends the prosecutor committed misconduct by impermissibly asking the jury to put themselves in the shoes of the incident's participants and describing his theory of how the murder occurred based on pure speculation, similar to the improper narrative presented in *Pierce*, 169 Wn. App. at 553.

The State has wide latitude to argue inferences from the evidence. *Gregory*, 158 Wn.2d at 841. However, a prosecutor commits reversible misconduct by urging the jury to decide a case based on evidence outside the record. *State v. Claflin*, 38 Wn. App. 847, 850-51, 690 P.2d 1186 (1984); *Pierce* 169 Wn. App. at 553. It is improper for a prosecutor to provide a first person narrative attributing thoughts to the defendant leading up to the crimes, or to present a fabricated and inflammatory account of the crimes. *Pierce*, 169 Wn. App. at 554-55.

During the prosecutor's opening statement, he described what the jurors would have observed if they watched the incident unfold:

36

Now, so if you were standing in what's known as the Buckshot Wildlife Area, there's a parking lot, near the Columbia River, between Mattawa and Desert Aire on the night of October the 15th, 2012, at approximately 7:45 in the evening, and you were standing there, it's about 60 degrees out, it's a new moon, it's fairly dark, there's no other vehicles in the parking lot.

You will see—you will see a 1995 gray Pathfinder driving towards you. It will come to a stop near a gated area. You're going to hear some people talking loudly. You can't quite make it out. They're speaking in Spanish. You recognize that they're again yelling at one another, a man and a woman. Suddenly, the driver's side door opens up, a man emerges. He's dressed in a black and white shirt, much like here, a woman is in the passenger side, she's wearing black pants, she has a black top, she has kind of a reddish brown vest on. You can't make out what they're saying, other than it's clear they're arguing.

You'll see the man as he gets out of the driver's door and walk around to the passenger side, he's holding a gun. He opens the door. She gets out. They're yelling something at each other again, it's in Spanish and you can't tell what it is, you don't speak Spanish.

Then you'd hear the weapon go off, ten times. You'll see the man eject the clip, shove another clip in, shoot two more rounds, saying something to her. She's not talking.

He grabs her by the arm, leads her down the path, about 75 yards, after she's taken a few steps, she's fighting back against him and her right shoe—she has high-heeled lady shoes on, and one of the shoes falls off. So now she's walking on one high-heel shoe and barefoot with the other foot. As she's being drug along. Drug approximately 75 yards to an area. You hear some more words between them. Suddenly the man, bam, bam, shoots her three more times. Two directly. The first shots—I shouldn't have said that, I got ahead of myself —were not shot into her.

But the scene, she drops and falls to the ground. She lays there for a while. You're going to see—you're going to see a photograph, you'll see her clawing throughout, you'll see some claw marks of her hands. Then you'll see the man, he walked up behind her and grabs her, because he sees that there's some olive—there's an olive grove, Russian olive grove towards the Columbia River. And decides he's going to hide the body.

37

He drags her approximately another 45, 50 yards. Between where he shot her and the stand of Russian olives is a fence line. He comes to that. As he's dragging her on her back side, he sets her down, gets over the fence, pulls her underneath the fence, drags her another 35, 40 yards to the Russian olive grove, pulls her in there, drops her body there, looks at her, begins to cover her up, decides he wants to make sure that the deal is done, bang, bang, bang, bang. He shoots her four more times. He finishes covering her up, and you see him hurriedly walk away back to the Pathfinder, get in the Pathfinder and leave.

RP (Apr. 1, 2016) at 954-57.

Unlike *Pierce*, these statements do not ask the jury to impermissibly step inside the shoes of Ms. Lopez or Mr. Aguilar. In *Pierce*, the prosecutor improperly argued in the first person what the defendant's thought process must have been, stating "'So he's thinking, "Alright. Who do I know in Quilecene that has money?" Okay. . . . "I want my meth now. . . . So hmm, I've got to get some money. He's not going to give it to me, so I need a gun, but I don't know anybody that has a gun."'" *Pierce*, 169 Wn. App. at 542.

In contrast, the comments here do not purport to describe the internal thoughts of Mr. Aguilar but instead describe what a third party would have observed on the night of crime. The evidence presented at trial generally supported the prosecutor's description of the events. The location and approximate time were consistent with the range established by the medical examiner. The narrative of Mr. Aguilar's conversation with Ms. Lopez and the subsequent sequence of events were supported by Mr. Galban's testimony and the

evidence at the crime scene, including shell casings and blood stains indicating Ms. Lopez was initially shot in the parking lot, walked 50 to 75 yards down the dirt service road, and was shot multiple more times. The comments that the man "decides" to hide the body and "decides he wants to make sure that the deal is done," are also something the jury could have inferred from the evidence in the record. RP (Apr. 1, 2016) at 956. The evidence indicated that Ms. Lopez was shot multiple times and then dragged off the service road and into the brush. Moreover, Mr. Galban testified that Mr. Aguilar told him that he put Ms. Lopez's body in the brush and covered her with branches to prevent discovery.

There was no direct testimony to support the prosecutor's supposition that Ms. Lopez and Mr. Aguilar were yelling at each other in Spanish. However, law enforcement testified that when they spoke with Mr. Aguilar, he spoke Spanish and required a translator. Moreover, Mr. Aguilar was accompanied throughout the trial by an interpreter, and Ms. Lopez's friends and family who testified spoke Spanish.

Even were we to find that this "unseen observer" narrative was improper and inflammatory similar to the narrative in *Pierce*, Mr. Aguilar has not demonstrated any prejudice. Mr. Aguilar did not object to this narrative and, accordingly, he waived any error unless he can demonstrate that this narrative "was so flagrant and ill intentioned that

an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. Mr. Aguilar has failed to meet this burden.

### 4. *Questioning of Defense Witness*

Mr. Aguilar also claims the prosecutor improperly pressed a defense witness to repeat other witness's testimony or vouch for the State's witnesses. He points to several instances where defense counsel objected to the State's cross-examination of the defense investigator.

Prosecutors may not ask witnesses to comment on whether another witness is lying. *State v. Ramos*, 164 Wn. App. 327, 334, 263 P.3d 1268 (2011). It invades the province of the jury to ask a witness to comment on another witness's testimony. *State v. Suarez-Bravo*, 72 Wn. App. 359, 366, 864 P.2d 426 (1994). However, a prosecutor does not commit misconduct by asking a witness whether another witness was mistaken, as such questions "'do not have the same potential to prejudice the defendant or show him or her in a bad light.'" *Ramos*, 164 Wn. App. at 334 (quoting *State v. Wright*, 76 Wn. App. 811, 822, 888 P.2d 1214 (1995)).

Mr. Aguilar's investigator, Karl Calhoun, sat at counsel table for the entire trial and confirmed on cross-examination that he listened to all the State's testimony and reviewed all discovery. The State did not interview Mr. Calhoun prior to trial, and Mr.

Calhoun did not prepare a report. When questioning Mr. Calhoun about what the police

found at the crime scene, the prosecutor asked whether it was possible police testified that

they had found a couple of unspent rounds on the ground. Defense counsel objected

because Mr. Calhoun could not testify about the evidence found at the crime scene as it

was not in his personal knowledge. The court held that normally a witness's opinion as to

another witness's testimony would be inadmissible, but it is permissible if it is just a

connecting question. The prosecutor later asked Mr. Calhoun whether he reviewed the

ballistic expert's report, and Mr. Aguilar objected. Outside the jury's presence, the court

noted that in his direct testimony, the investigator gave an expert opinion questioning the

quality of the State's investigation and testified to "basically inadmissible" evidence, i.e.,

the things that the State did not do during the investigation, transferring focus from proof

beyond a reasonable doubt to what actions the State could have taken but did not. RP

(Apr. 19, 2016) at 3225. The court ruled the State could ask questions on specific topics

raised in defense's direct examination of Mr. Calhoun and overruled a number of Mr.

Aguilar's objections.

On this record, it appears that the State's questioning of Mr. Calhoun with respect

to the State's investigation and the State's witnesses was proper where Mr. Calhoun

attacked the State's investigation on direct examination and the comments were used to

introduce lines of questioning as to Mr. Calhoun's testimony on direct. Mr. Aguilar has

failed to demonstrate these questions were improper and has failed to present any

argument that this questioning prejudiced him.

### 5. *Pursuing Alien in Possession of Firearm Charge*

Mr. Aguilar's final argument with respect to the prosecutor's performance is that

the prosecutor improperly pursued the alien in possession of a firearm charge as a means

of highlighting Mr. Aguilar's noncitizen status for the jury. He claims that under *Salas v.*

*Hi-Tech Erectors*, 168 Wn.2d 664, 230 P.3d 583 (2010), a party's immigration status is

not admissible where any potential relevance is outweighed by the danger of unfair

prejudice. Mr. Aguilar contends that where this count was dismissed mid-trial for

insufficient evidence, it is clear the State pursued this charge for the sole improper

purpose of introducing Mr. Aguilar's immigrant status to the jury.

Appeals to nationality or other prejudices are highly improper in a court of justice

and evidence as to the immigration status of a person whose act is in question is generally

irrelevant and inadmissible if introduced for such a purpose. *State v. Avendano-Lopez*, 79

Wn. App. 706, 718, 904 P.2d 324 (1995). Our Supreme Court recently acknowledged

that "immigration is a politically sensitive issue [and that] [i]ssues involving immigration

can inspire passionate responses that carry a significant danger of interfering with the fact

finder's duty to engage in reasoned deliberation." *Salas*, 168 Wn.2d at 672.

The State charged Mr. Aguilar with the crime of alien in possession of a firearm without a license, RCW 9.41.171, which required the State to prove that Mr. Aguilar was not a United States citizen and not a lawful permanent resident, and did not have a valid alien firearm license or meet the requirements of RCW 9.41.175. The State based this charge on evidence that Mr. Aguilar immigrated to this country from Honduras, he did not have a Washington State identification card, Social Security number, or alien firearms license, and law enforcement found a gun in his bedroom.

Although many of Mr. Aguilar's statements related to his immigration status were suppressed, the jury heard that Mr. Aguilar told a detective he did not have a weapon, saying, "'You need a permit to have weapons.'" RP (Apr. 15, 2016) at 3087. A records manager for the Department of Licensing testified that Mr. Aguilar did not have a firearms license. During opening statement, the prosecutor told the jury that there was evidence to show that Mr. Aguilar was not a citizen. After the State rested, the court concluded that the evidence remaining after suppression did not prove Mr. Aguilar's immigration status and dismissed count 5.

Unlike *Salas*, where immigration status was only relevant to the employee plaintiff's future potential earning ability and, accordingly, the potential prejudice

43

outweighed the relevance, here evidence of Mr. Aguilar's immigration status was an

essential element of the crime.[8]  Although the trial court ultimately dismissed the charge

for insufficient evidence, this does not prove an improper motive for pursuing this charge.

Where the State had evidence that Mr. Aguilar immigrated to this country in 2007, had

not obtained a state identification card, Social Security number, or other documents

entitling him to be in the country, he did not have a firearms license, and police recovered

a gun in his bedroom, the State had sufficient evidence to support pursuing this charge.

The fact that the court ultimately deemed most of the evidence inadmissible does not

prove the State had an improper motive in pursuing this charge.  On this record, this court

cannot conclude that the State committed prosecutorial misconduct by pursuing this

claim.

### D.    No Cumulative Error

Mr. Aguilar contends that in the event this court finds that no individual error

requires reversal, the court should still find that the combined errors of the trial court

warrant reversal based on their cumulative effect.

---

[8] Since Mr. Aguilar's case was decided, the Supreme Court adopted ER 413 (effective on September 1, 2018), which generally makes immigration status evidence inadmissible but provides that evidence of a party's immigration status shall be admissible in a criminal matter where immigration status is an essential fact to prove an element of the charged criminal offense.

The combination of trial errors may deprive a person of a fair trial, even where some errors viewed alone might not be grave enough to require reversal. *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984); *State v. Jackson*, 150 Wn. App. 877, 889, 209 P.3d 553 (2009). However, "[a]bsent prejudicial error, there can be no cumulative error that deprived the defendant of a fair trial." *State v. Saunders*, 120 Wn. App. 800, 826, 86 P.3d 232 (2004). "The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary." *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009) (citing *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994)).

Mr. Aguilar has failed to demonstrate prejudicial error. Accordingly, he has failed to demonstrate cumulative error requiring reversal of his convictions.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

*SAG ISSUE 1. Whether the trial court erred by failing to give the jury a* Petrich *instruction with respect to the aggravating factors of deliberate cruelty and egregious lack of remorse.*

Mr. Aguilar contends that he was entitled to a *Petrich* instruction with respect to both of the aggravating circumstances because the State presented evidence of multiple acts the jury could rely on in finding the aggravating circumstances. Since the trial court ultimately concluded insufficient evidence supported the jury's finding of deliberate

45

cruelty, Mr. Aguilar's argument with respect to that aggravator is moot, and we accordingly do not address *Petrich* application to that aggravator. *See State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995).

The Sentencing Reform Act of 1981, chapter 9.94A RCW, authorizes exceptional sentences above the standard range in certain circumstances. RCW 9.94A.535. The fact that the "defendant demonstrated or displayed an egregious lack of remorse" is an aggravating circumstance that can support a sentence above the standard range. RCW 9.94A.535(3)(q). Although an aggravating factor is not an element of the underlying crime, it must be proved as it if were an element. *State v. Roswell*, 165 Wn.2d 186, 193, 196 P.3d 705 (2008). "The facts supporting aggravating circumstances shall be proved to a jury beyond a reasonable doubt. The jury's verdict on the aggravating factor must be unanimous, and by special interrogatory." RCW 9.94A.537(3).

Only a unanimous jury can return a guilty verdict in a criminal case. *State v. Camarillo*, 115 Wn.2d 60, 64, 794 P.2d 850 (1990). Where the evidence shows multiple acts occurred that could constitute the charged offense, the State must either choose which act it relies on or instruct the jury that it must unanimously agree on which act it found. *Petrich*, 101 Wn.2d at 572. Constitutional error occurs if there is no election and

46

no unanimity instruction is given. *State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009); *Kitchen*, 110 Wn.2d at 411. A constitutional error requires a new trial unless shown to be harmless beyond a reasonable doubt. *Camarillo*, 115 Wn.2d at 64.

Here, the jury was instructed that its verdict on the aggravating factors must be unanimous. The jury was also instructed that egregious lack of remorse means "the defendant's words or conduct demonstrated extreme indifference to harm resulting from the crime." CP at 958 (instruction 28). The jury could consider whether Mr. Aguilar's "words or conduct (a) increased the suffering of others beyond that caused by the crime itself; (b) were of a belittling nature with respect to the harm suffered by the victim, or others; or (c) reflected an ongoing indifference to such harm." CP at 958 (instruction 28). The court further instructed the jury that it could not consider Mr. Aguilar's denial of guilt, his silence, or his failure to accept responsibility for the murder.

Mr. Aguilar's proposed jury instructions did not include a *Petrich* instruction for the aggravating circumstances, and the court did not give a *Petrich* instruction. The jury returned special verdicts finding both egregious lack of remorse and deliberate cruelty. Mr. Aguilar brought a posttrial motion to dismiss both aggravators, arguing the court erred by failing to give a *Petrich* instruction since the State presented evidence of multiple acts that could support a finding of each aggravator. The court denied the

47

motion, finding that the jury could unanimously agree on the aggravating factor without being unanimous as to the underlying facts that led them to the special verdict on that factor. The court ultimately found that insufficient evidence supported the deliberate cruelty aggravator, but imposed an exceptional sentence based on the finding of egregious lack of remorse.

The *Petrich* rule only applies "where several acts are alleged, any one of which could constitute the crime charged." *State v. Crane*, 116 Wn.2d 315, 325, 804 P.2d 10 (1991); *see also Petrich*, 101 Wn.2d at 571 (rule applies where State presents evidence of several distinct acts but not where evidence indicates a continuing course of conduct). To determine whether *Petrich* is applicable, the courts consider three questions: (1) what must be proved under the applicable statute, (2) what does the evidence disclose, and (3) does the evidence disclose more than one violation of the statute. *State v. Hanson*, 59 Wn. App. 651, 656-57 & n.5, 800 P.2d 1124 (1990). The third inquiry "requires a comparison of what the statute requires with what the evidence proves. If the evidence proves only one violation, then no *Petrich* instruction is required, for a general verdict will necessarily reflect unanimous agreement that the one violation occurred," even though it may have been done through alternative means. *Id.* at 657.

The *Petrich* rule may apply to a jury's finding regarding an aggravating

circumstance. *See State v. Price*, 126 Wn. App. 617, 647, 109 P.3d 27 (2005),

*abrogated on other grounds by State v. Hampton*, 184 Wn.2d 656, 361 P.3d 734 (2015).

In *Price*, the defendant was charged with aggravated first degree murder pursuant to

RCW 10.95.020. *Price*, 126 Wn. App. at 629. One of the alleged aggravating

circumstances charged was that the defendant had engaged in the practice of three or

more assaults or incidents of harassment against the victim within a five-year period. *Id.*

The State introduced evidence of five prior incidents of harassment and/or assault

involving the defendant and the victim. On appeal, the defendant claimed the trial court

erred by failing to instruct the jury it was required to be unanimous as to which of the five

incidents satisfied the aggravating factor. *Id.* at 645. Division Two of this court agreed

with the defendant that the court erred by failing to provide a unanimity instruction, but

held the error was harmless because no rational trier of fact could have entertained a

reasonable doubt that each incident established the criminal conduct charged beyond a

reasonable doubt. *Id.* at 647.

Since *Price*, few Washington cases have addressed the need for unanimity

instructions with respect to aggravators. In an unpublished decision, *State v. Bell*, noted

at 159 Wn. App. 1002, 2010 WL 5464753, Division One held that where the aggravator

49

charged was a pattern of abuse, which contemplated an ongoing course of conduct rather than a single action (or a discrete number of actions as in *Price*), unanimity was only required as to the defendant's course of conduct, not a particular action. *Id.* at \*17. However, it appears that no Washington court has considered whether a *Petrich* instruction is required for an egregious lack of remorse aggravator. Accordingly, this court must resolve this issue of first impression by applying the three-part test to determine *Petrich* applicability.

First, with respect to the initial question of what the State needed to prove under the "to convict" instruction, the State had to prove Mr. Aguilar's words or conduct following Ms. Lopez's murder demonstrated extreme indifference to harm resulting from the crime. The jury could consider whether Mr. Aguilar's words or conduct increased the suffering of others beyond the suffering flowing from the crime itself, or belittled the harm Ms. Lopez suffered, or reflected an ongoing indifference to such harm. *See* CP at 958.

The second question, "what does the evidence disclose," is viewed in the light most favorable to the proponent of the instruction. *Hanson*, 59 Wn. App. at 656-57. However, where the defendant is the proponent of a *Petrich* instruction, it is necessary to view the evidence in the light most favorable to the State, since the court must discern

whether the evidence is such that jurors could find more than one event sufficient to convict. *Id.* at 656 n.6. When the evidence is viewed in the light most favorable to the State, it demonstrated that: (i) Mr. Aguilar laughed as he told Mr. Galban he was responsible for Ms. Lopez's death and (ii) that Mr. Aguilar made telephone calls to Ms. Lopez's family, her fiancé, and her friend in which he yelled at them for calling Ms. Lopez's telephone, told them Ms. Lopez was alive and well in Mexico, and indicated that either Ms. Lopez or her telephone might be returned to them upon payment of an unspecified sum of money.

The final question of the *Petrich* analysis, "does the evidence disclose more than one violation of the statute," requires a comparison of what the statute requires with what the evidence proves. *Hanson*, 59 Wn. App. at 657. Here, the statute requires words and conduct following the criminal act that display a single, specific state of mind. Although Mr. Aguilar contends that the lack of remorse aggravator is intended to punish specific behavior or acts rather than a state of mind, Washington courts have historically treated the egregious lack of remorse aggravating factor as a state of mind that may be proved by multiple discrete examples of words and conduct displaying that state of mind.

In *State v. Ross*, 71 Wn. App. 556, 563-64, 861 P.2d 473, 883 P.2d 329 (1993), the court found the State supported the egregious lack of remorse factor by showing that Mr.

Ross continued to blame the justice system for his crimes and that his statement that he was sorry was not credible. The court noted that "[w]hether a sufficient quantity or quality of remorse is present in any case depends on the facts." *Id.* at 563. Another court found egregious conduct when a woman joked with her husband's killer about sounds her husband made after the killer shot him and went to meet a boyfriend's family 10 days after her husband's death. *State v. Wood*, 57 Wn. App. 792, 795, 790 P.2d 220 (1990). Similarly, the court found a sufficient lack of remorse where the defendant bragged and laughed about the murder, thought the killing was funny, joked about being on television for the murder, and told police he felt no remorse. *State v. Erickson,* 108 Wn. App. 732, 737-40, 33 P.3d 85 (2001).

More recently, this court found sufficient lack of remorse where the defendant asked the victim's husband if he was "'ready to bleed?'" moments after the victim died, he was smiling and laughing while talking to officers at the crime scene, he joked with an officer at the hospital that he had better not ride a Ninja motorcycle because he might get killed too, and smiled and waved at inmates in the prison and said, "'[F]ellows, if you hit someone on a motorcycle, don't get caught.'" *State v. Zigan*, 166 Wn. App. 597, 602-03, 270 P.3d 625 (2012) (alteration in original).

The language of the Washington Pattern Jury Instruction for this aggravator also reflects the courts' historic treatment of this aggravator as an ongoing mental state that may be proved by multiple displays or demonstrations rather than one discrete act. *See* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 300.26 at 811 (4th ed. 2016) (aggravator may be proved by words or conduct that "reflected *an ongoing indifference* to such harm" (emphasis added)).

This aggravator is distinguishable from the one at issue in *Price*. There, where the aggravator specifically required the State to prove at least three prior criminal acts and the State produced evidence of five prior criminal acts, there was a concern that the jury might not agree on the same three criminal acts when determining whether the State had proved sufficient evidence to support the aggravator. Accordingly, the aggravator and supporting evidence at issue there presented the typical multiple acts scenario contemplated by *Petrich*.

In contrast, the aggravator here is a specific state of mind that may be displayed or demonstrated by the defendant's various conduct following the criminal act. No matter how many examples of conduct or words the jury found demonstrated an egregious lack of remorse, the aggregated conduct only proves one violation of the statute.

As the trial court noted, the jury's consideration of the words or conduct supporting this aggravator is more analogous to the jury's consideration of the preliminary factual issues underlying the verdict than the jury's consideration of alternative acts, which each could constitute the charged crime. The United States Supreme Court has observed that although juries must be unanimous as to the ultimate issues of a given case, "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *McKoy v. North Carolina*, 494 U.S. 433, 449, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (Blackmun, J, concurring). The unanimity requirement requires substantial agreement as to the principal factual elements underlying a specific offense, but does not require that the jury agree as to every individual piece of evidence. *Id.* at n.5.

Following this reasoning, this court recently observed that "it is well settled that the jury need not agree on the particular evidence that satisfies the element or, if the legislature has provided that the element can be satisfied by alternative means, the jury need not agree on the means." *State v. Hoguin*, No. 31239-9-III, slip op. at *3 (Wash. Ct. App. Jan. 15, 2015) (unpublished), http://www.courts.wa.gov/opinions/pdf/312399.unp.pdf. The court held that *Petrich* does not apply to cases where "the State points to several pieces of evidence (even if it is

54

evidence of acts) as probative of a discrete element." *Id.* at \*4. In that case, the court concluded that evidence the defendant took multiple items of property, with the use or threatened use of force demonstrated by evidence of several acts of resistance, proved only one crime of second degree robbery and since the State was not alleging multiple acts of robbery, no unanimity instruction was required. *Id.*

Similarly here, the State produced evidence of several instances of conduct or words on the part of Mr. Aguilar from which a jury could infer one specific state of mind: an egregious lack of remorse. The jury considered this evidence as part of its consideration of all the factual circumstances surrounding the charged criminal acts. Just as the jury did not have to be unanimous as to the underlying facts it relied on to conclude Mr. Aguilar was guilty of first degree murder, it did not have to be unanimous as to the individual facts it relied on to conclude that Mr. Aguilar demonstrated an ongoing indifference to Ms. Lopez's death.

We conclude that under the three-part *Petrich* test and the Washington courts' historic treatment of egregious lack of remorse as a state of mind that may be inferred from multiple examples of words and conduct, the trial court did not err by concluding that a *Petrich* instruction was not necessary. The trial court properly denied Mr. Aguilar's motion to dismiss the special verdict.

  *SAG ISSUE 2.  Whether the trial court violated the real facts doctrine under RCW 9.94A.530(2) and Mr. Aguilar's Sixth Amendment right to a jury trial.*

  Mr. Aguilar contends the trial court violated the real facts doctrine by finding that the telephone calls to Ms. Lopez's family supported a finding of egregious lack of remorse where the State argued and the jury found that the telephone calls instead supported a finding of deliberate cruelty.

  A court may depart from the presumptive sentence range if the offense involves substantial and compelling circumstances.  RCW 9.94A.535.  This court reviews the sentencing judge's reasons for an exceptional sentence under the clearly erroneous standard to determine whether there is sufficient evidence in the record to support the court's reason for imposing an exceptional sentence.  *See, e.g.*, *State v. France*, 176 Wn. App. 463, 469, 308 P.3d 812 (2013); RCW 9.94A.585(4).

  The real facts doctrine, RCW 9.94A.530(2), provides in part, "In determining any sentence other than a sentence above the standard range, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing, or proven pursuant to RCW 9.94A.537."  To be entitled to raise a real facts doctrine issue on appeal, the defendant must demonstrate that he raised a "timely and specific objection" to the sentencing court's consideration of the allegedly improper information.  *State v. Grayson*, 154 Wn.2d 333, 338-39, 111 P.3d

1183 (2005).

Here, the court instructed the jury that it was its duty to decide the facts in the case based on the evidence presented during the trial and that the evidence it was to consider consisted of the testimony from witnesses, stipulations, and the admitted exhibits. It was further instructed that the lawyers' statements are not evidence, the evidence is the testimony and the exhibits, and that it must disregard any remark, statement, or argument not supported by the evidence or the law in the jury instructions. As noted above, the jury was also instructed that when determining the aggravator of egregious lack of remorse, the jury could consider whether Mr. Aguilar's words or conduct increased the suffering of others beyond the suffering flowing from the crime itself, or belittled the harm Ms. Lopez suffered, or reflected an ongoing indifference to such harm. *See* CP at 958.

During closing argument, the State argued that the telephone calls to Ms. Lopez's family and friends supported a finding of deliberate cruelty. The prosecutor did not argue the telephone calls supported a finding of egregious lack of remorse. At sentencing, the trial court noted that the State mixed up its arguments during closing with respect to which facts supported the respective aggravators. The court then held that this argument did not result in a situation where the court could not impose the aggravating factors found by the jury, noting that ultimately the court looks at the evidence and the fact that

57

something got "inadvertently twisted around" in closing arguments was not fatal to the aggravators. RP (Sept. 30, 2016) at 3550. The court concluded that there was insufficient evidence to support the deliberate cruelty aggravator, but that the telephone calls demonstrated an egregious lack of remorse and imposed an exceptional sentence based on that aggravator. *Id.* at 3554.

This court presumes the jury followed the court's instructions. *Case*, 49 Wn.2d at 84 (citing *State v. Kelsey*, 46 Wn.2d 617, 625, 283 P.2d 982 (1955)). Accordingly, we presume the jury followed the court's instructions and disregarded the remarks of counsel to the extent they were not supported by the evidence or conflicted with the instruction on egregious lack of remorse. The closing argument did not prevent the jury from considering the telephone calls as evidence of an egregious lack of remorse, where the jury was instructed to consider all the evidence presented at trial to determine whether Mr. Aguilar's words and conduct following Ms. Lopez's murder demonstrated extreme indifference to harm resulting from the crime.

Mr. Aguilar contends that in the absence of evidence that the jury unanimously found he made the telephone calls and unanimously relied on the telephone calls to find an egregious lack of remorse, the trial court violated the real facts doctrine by relying on the telephone calls to impose the lack of remorse aggravator. However, this argument

58

relies on the faulty reasoning posited in his above argument that a *Petrich* instruction was required for the aggravating factors. Under the reasoning set forth above, the jury did not have to be unanimous as to which specific instances of conduct evidenced a lack of remorse—it simply had to be unanimous that the evidence demonstrated an egregious lack of remorse.

In sum, the trial court did not violate the real facts doctrine by concluding that the telephone calls to Ms. Lopez's family and friends constituted sufficient evidence to support the jury's finding of egregious lack of remorse.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Korsmo, J.

Fearing, J.

59